928 P.2d 883

**In the Interest of Jane DOE, Born on May 22, 1976.**

**Nos. 18237, 18678.**

Supreme Court of Hawai'i.

Dec. 16, 1996.

Jay K. Goss and John Campbell, Jr., Deputy Attorneys General, on the briefs, Honolulu, for appellant Department of Human Services.

Michael A. Tongg, guardian ad litem, on the briefs, Honolulu, for minor-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

In these two appeals,[1] the Department of Human Services (DHS) of the State of Ha-

---

1. Although these appeals have not been consolidated and were independently briefed, we address the appeals together in this opinion be- cause they arise from the same event. *See Birmingham v. Fodor's Travel Publications,*

wai'i appeals from several collateral orders of the family court of the first circuit entered during the course of adjudicating the status of Jane Doe (Minor). On appeal, the DHS contends that the family court: (1) erred in finding that the home of the Minor's father was not safe; and (2) abused its discretion in awarding DHS temporary legal custody and in making interim orders that, *inter alia,* directed the DHS to pay foster board payments and other costs related to the care of the Minor.

We disagree with the DHS's first point of error because the family court's finding of fact that the home of the Minor's father was unsafe is not clearly erroneous. We agree with the DHS's second point of error that the family court did not have the power to award temporary *legal* custody pursuant to Hawai'i Revised Statutes (HRS) § 571–48. However, because we view the family court custody award as being one of temporary "foster" (as opposed to "legal") custody, we affirm, in part, the family court's interim orders requiring the DHS to pay for the Minor's care; we reverse those orders that require the DHS to pay foster board payments for periods after the Minor's eighteenth birthday.

## I. *BACKGROUND*

On December 23, 1993, pursuant to HRS chapter 571, family court probation officer Christine Y. Ikehara filed a petition (runaway petition) alleging that:

> On or about October 11, 1993, in the City and County of Honolulu, State of Hawaii[, the Minor] was beyond the control of her parent in that she left home without permission and remained away until November 3, 1993, which behavior brings the said minor within the purview of HRS Section 571–11(2)(B) and HRS Section 577–6.

*Inc.,* 73 Haw. 359, 365 n. 2, 833 P.2d 70, 74 n. 2. (1992).

**2.** Patrick Pascual was the GAL at this hearing. However, Pascual later withdrew as the Minor's GAL, and Michael A. Tongg was subsequently appointed as the Minor's GAL.

**3.** Pursuant to HRS § 571–2 (1993),

On February 2, 1994, three months and twenty days shy of the Minor's eighteenth birthday, a hearing was held on the petition before the family court. Present at the hearing were Ikehara, Minor, Minor's father, Minor's guardian ad litem (GAL),[2] Patsy Takemura (Minor's counsel), Jacob Pakele (Minor's boyfriend), and Jensen Pakele (Jacob's father). Because the DHS was not given prior notice of the hearing, a DHS representative did not attend the hearing.

At the hearing, the court inquired of the Minor's father whether he thought it was in either the Minor's or his best interests that the Minor be returned to his home. He answered "no," stating that he wanted to see the Minor placed in a detention home "temporarily until we can have a discussion and get this straightened out because this [ (the Minor's running away) ] is not going to stop." The court then questioned Jensen Pakele, who testified that the Minor had been staying at his home since the beginning of January 1994. During that time, the Minor had been attending substance abuse meetings twice weekly, although she was not attending school.

The Minor's counsel made the following request:

> Your Honor, pursuant to our pre-chamber conference I believe Ms. Ikehara and Mr. Pascual as well as myself on behalf of the minor [are] asking that the DHS become involved in the case and that they be allowed—or they be ordered to be temporary legal guardian of the minor. But in the meantime we would ask that Mr. Pakele have custody or supervision over [the Minor] and that she be—continue to reside with him on the Big Island.

Notwithstanding the DHS's absence, the court ordered that:

> DHS. [is] awarded temporary legal custody.[3] Minor shall contact [the Depart-

> "Legal custody" means the relationship created by the court's decree which imposes on the custodian the responsibility of physical possession of the minor and the duty to protect, train, and discipline the minor and to provide the minor with food, shelter, education, and ordinary medical care, all subject to residual parental rights and responsibilities and the rights and responsibilities of any legally appointed guardian of the person.

ment of Education] on [the] Big Island within one week to resume her education or file 4140 Form if she will be employed fulltime. Minor shall continue to attend [Narcotics Anonymous] & [Alcoholics Anonymous] meetings twice a week. Temporary custody awarded to Mr. Pakele.

After ruling, the court decided against holding an order to show cause (OSC) hearing to enable the DHS to challenge the court's award of temporary legal custody of the Minor to the DHS. The court reasoned that it was not required by statute or case law to hold an OSC hearing and that such hearing would inconvenience the parties, many of whom lived and worked on the island of Hawai'i. Thus, the court indicated that should the DHS wish to have an OSC hearing, it could so move.

The court's order was entered on February 2, 1994 and contained a "cc:" to the DHS.[4]

On April 15, 1994, the Minor's GAL filed a motion for a show cause hearing as to why sanctions should not be imposed against the DHS (motion to show cause). The motion set forth verified facts concerning the DHS's failure to (1) pay foster board payments to Jensen Pakele and (2) provide medical insurance coverage and clothing allowances for the Minor. The motion also requested makeup educational services for the four months it took the DHS to enroll the Minor in school. A copy of the motion was served on the DHS.

A hearing on the motion to show cause was held on April 26, 1994 and several DHS representatives attended: deputy attorney general Jackie desMarets, representing the DHS; DHS case supervisor Ralph Aona; and DHS social worker Yvonne Samia. During the hearing, Aona acknowledged receipt of the February 2, 1994 court order, but stated that the DHS had not been present at the hearing and had not taken any action in connection thereto. The DHS's position was that it should not be forced to pay for the Minor's placement on the Big Island because it would have returned her to her father's home insofar as it did not consider the home to be unsafe, notwithstanding the family court's finding to the contrary.

The court reprimanded the DHS for its inaction and noted that the DHS should have contacted the deputy attorney general and filed a motion for clarification. Although the court recognized that responsibility for the situation did not lie exclusively with the DHS and asserted that "[t]his is partially the court's problem," it nonetheless criticized the DHS, stating:

> [Y]ou folks have a duty to follow through when you're given temporary legal custody like this. If you don't want it or think there's something wrong with it you folks got to bring it back to court so that it can be clarified and—and something done about it. But it just can't be kind of put in a holding pattern.

The DHS thereafter requested a continuance for the purpose of exploring, *inter alia*, payment of the Minor's costs. The court granted the request, but warned the DHS that there was a "strong likelihood" that it would order the DHS to fulfill the GAL's requests for, among other things, foster board and clothing allowance payments.[5] The court admonished the DHS to "rectify the situation."

As to the DHS's goal of reuniting the Minor with her father, the court agreed to return her to her father's home, but only

---

4. Although a DHS case supervisor acknowledged receiving a copy of the February 2, 1994 order, no proof of service document is contained in the record that indicates that the DHS was actually served. However, on February 8, 1994, the Minor's GAL filed a certificate of service, certifying that he served a certified copy of the February 2, 1994 order on deputy attorney general Marianne Magnier, in her capacity as attorney for the DHS.

 On February 28, 1994, the court held a hearing on the Minor's GAL's motion to withdraw. *See supra* note 2. Among those present at the hearing was deputy attorney general Jackie desMarets, representing the DHS, who did not object to the GAL's motion to withdraw. However, when informed by the court that the DHS had been ordered to be the Minor's temporary legal custodian, desMarets indicated that she would not speak on the custody issue.

5. The court also noted the that it would probably order the DHS to provide medical coverage for the Minor and pay the costs for her educational make-up.

after receipt of an updated report on the Minor's home situation and the current status of her father's behavior.[6] Aona agreed to provide the court with "safe home guidelines" (SHG).

On May 9, 1994, the court held a further hearing on the GAL's motion to show cause. At the hearing, the DHS argued that, notwithstanding the court's February 2, 1994 order, it was the family court and not the DHS that became the Minor's legal custodian on that day. The DHS further argued that, because the Minor's case did not involve safety issues, "the family home is the home that the child should have been in." After hearing arguments from all parties, the court reiterated its belief that the DHS could have taken action on the original February 2, 1994 order by "bringing it back to court and making [the judge] clarify exactly what he meant."

The court subsequently granted the motion, but declined to sanction the DHS. Instead, the court, in a written order filed on May 16, 1994, ordered that

(1) DHS ... shall pay foster board payments to Mr. Pakele commencing February 2, 1994 until such time as the trial on the runaway is resolved.

(2) DHS shall reimburse foster parents (M/M Pakele) for all costs, travel and all other costs (clothing, medical, dental) related to the care of said child.

(3) DHS to work with the Department of Education to see if Minor can receive exemption for summer school ... otherwise DHS shall pay the $125.00 summer education course fee.

(4) DHS shall reimburse the GAL for all costs for travel, which cost shall be itemized and submitted to DHS. Otherwise, GAL attorney fees shall be paid by Family Court.

(5) The runaway trial is taken off calendar until moved on by any party.

(6) All other orders not inconsistent with this order are continued until further order of the court or until the runaway charge is resolved.

On May 27, 1994, the DHS filed a timely motion for reconsideration. The court held a hearing on June 15, 1994. After hearing arguments from both parties, the court denied the motion and explained that:

If you [(the DHS)] didn't understand [the order], you should have contacted [the Attorney General] directly and not just sit on this thing until the guardian ad litem comes back and has to make all these requests because of the silence, the acquiescence and the nothing that was done from the time they got the order until [the GAL] makes the motion. That therein lies the problem.

. . . .

By your silence and acquiescence you folks had responsibility over this child. You cannot come now months later and say, but Judge we didn't understand and, you know, it's not our problem. No.

. . . .

So, number one. Too little too late.

Number two. The Judge didn't make the ruling in the vacuum, the home was not safe. I confirmed that today.

. . . .

You folks will comply with this Court's order.

On June 29, 1994, the DHS filed a motion for immediate review for an order to dismiss the DHS as the Minor's legal custodian and to stay the court's prior orders until conclusion of the appeal (motion for review). The court heard and orally granted, in part, and denied, in part, the DHS's motion on July 11, 1994. The written order was filed on August 3, 1994. Specifically, the court granted the DHS's request to revoke its temporary legal custody status of the Minor because the Minor had attained the age of majority on May 22, 1994. The court denied the remainder of the motion for review, based in part on its findings that (1) "the return of this child home to her father at this time is [not] in the best interest of this child; in addition, there are no adequate safeguards in [the] father's present home to provide assurances that this child would be safe from harm or threatened

---

**6.** The Minor had alleged that she had been physically abused by her father, that is, that he hit her with open and closed fists, a slipper, a broomstick, and a belt.

harm as defined under HRS 587" and (2) "DHS ... did nothing to change, modify[,] and/or revoke [the] temporary legal custody order." The court noted that the "motion today as well as the past motions ... [are denied on] the grounds of waiver." Accordingly, the court ordered the DHS to continue paying foster board payments to Pakele through July 1994. In addition, the court ordered that the DHS remain a party until it complied with all orders or until final resolution of the case. The DHS timely filed a motion for reconsideration of the court's oral ruling, which was denied on August 1, 1994.

On August 4, 1994, a further hearing was held on the runaway petition. Because there seemed to be some dispute as to whether the Minor ran away or was "kicked out" of her father's home, the court set the matter for trial.[7] Further, at the August 4 hearing, the GAL made an oral motion to compel the DHS to continue paying foster board payments to the Pakeles until December 31, 1994. Over the objection of the DHS, the court granted the motion.

Thereafter, on August 8, 1994, the DHS filed a motion for reconsideration, which was heard on August 18, 1994. The court denied the motion for reconsideration in a written order entered on December 21, 1994.

The DHS appeals (Supreme Court No. 18237) from the: (1) May 16, 1994 order granting the GAL's motion to show cause; (2) June 15, 1994 order denying reconsideration of the May 16 order; (3) August 3, 1994 order affirming the DHS's obligation to pay temporary foster board costs until July 31, 1994; and (4) August 1, 1994 order denying reconsideration of the oral ruling documented in the written order filed on August 3, 1994. The DHS also appeals (Supreme Court No. 18678) from the: (1) August 4, 1994 order requiring the DHS to pay the Minor's temporary board costs until December 31, 1994; and (2) the December 21, 1994 order denying reconsideration of the August 4 order.

---

7. On December 21, 1994, the Minor was adjudicated to have been "beyond the control of [her]

## II. *DISCUSSION*

### A. *Standards Of Review.*

■ We have previously held that the "family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion." *In re Jane Doe,* 77 Hawai'i 109, 115, 883 P.2d 30, 36 (1994) (citing *Fujikane v. Fujikane,* 61 Haw. 352, 355, 604 P.2d 43, 45 (1979)). "Under the abuse of discretion standard of review, the family court's decision will not be disturbed unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant[, and its] decision clearly exceed[ed] the bounds of reason." *Doe,* 77 Hawai'i at 115, 883 P.2d at 36 (internal quotation marks and citation omitted).

■ We review a trial court's findings of fact (FOFs) under the "clearly erroneous" standard. *State v. Naeole,* 80 Hawai'i 419, 423 n. 6, 910 P.2d 732, 736 n. 6 (1996) (citation omitted). Under this standard, we will not disturb a FOF unless we are left, after examining the record, with a "definite and firm conviction ... that a mistake ha[s] been committed." *Id.* (citation omitted). "The test on appeal is ... whether there was substantial evidence to support the conclusion of the trier of fact. 'Substantial evidence' ... is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *State v. Wallace,* 80 Hawai'i 382, 391–92, 910 P.2d 695, 704–05 (1996) (citation omitted).

■ Conclusions of law (COLs) are "not binding upon an appellate court and [are] freely reviewable for [their] correctness." *Id.* at 391, 910 P.2d at 704 (citation omitted). Thus, we review COLs *de novo* under the right/wrong standard. *Id.* (citation omitted).

### B. *The Family Court Did Not Clearly Err In Finding That The Home of Minor's Father Was Unsafe.*

■ First, DHS challenges the family court's FOFs that "the home [of Minor's

---

parent" under HRS § 571–11(2).

father] is not safe" and that "there are no adequate safeguards in [the] father's present home to provide assurances that this child would be safe from harm or threatened harm as defined under HRS [chapter] 587." The DHS maintains that there is no evidence on which to base a finding that the home was not safe and that, therefore, such a finding is clearly erroneous. We disagree.

There is evidence in the record that the Minor was physically abused by her father. She claimed that her father hit her with open and closed fists, a slipper, a broomstick, and a belt. *See supra* note 6. The SHG, filed May 6, 1994, reported that on May 6, 1993, the Minor was taken into police protection because of alleged physical abuse by her father. The SHG also reported, among other things, that the Minor had a total of 127 unexcused absences from classes at Campbell High School between September and December 7, 1993. The SHG noted that "[i]t is not likely that [the Minor's father] will be able to provide the emotional support that his daughter desires." Moreover, as previously indicated, the Minor's father felt that it was not in his best interest or the best interest of his daughter that she return to his home. He stated that: (1) she was "beyond his control"; (2) she kept running away; and (3) he wanted to see her placed in a detention home "temporarily until we can have a discussion and get this straightened out because this is not going to stop."

 The DHS does not argue that the testimony or the SHG are inaccurate; rather, it contends that the family court could not use this evidence in concluding that the father's home was unsafe because the testimony was unsworn and the document was not received into evidence. Precluding the family court from considering such evidence would clearly contravene the explicit legislative purpose of the Child Protective Act, *see* section II.C.2., *infra*, as well as HRS § 587–41, which expressly provides that, "[i]n a temporary foster custody hearing, a determination that there exists reasonable cause to believe that a child is subject to imminent harm may be based upon relevant evidence, including, *but not limited to*, hearsay evidence...." (Emphasis added.) Fur-

thermore, HRS § 587–40(c) (1993) explicitly provides that "[a] written report submitted pursuant to [section 587–40(a) ] shall be admissible and may be relied upon to the extent of its probative value in any proceeding under this chapter[.]" *See* section II.C.3., *infra* (holding that this proceeding is in fact a chapter 587 proceeding).

Based on our review of the record, we are not left with a "definite and firm conviction that a mistake has been committed." We therefore hold that the family court's FOF that the home of Minor's father was unsafe is supported by substantial evidence and is not clearly erroneous.

C. *The Family Court's Custody Award Was An Abuse Of Discretion As An Award of Temporary Legal Custody, But Was Not An Abuse Of Discretion As An Award Of Temporary Foster Custody.*

In its second point on appeal, the DHS contends that the family court abused its discretion in awarding the DHS temporary legal custody of the Minor pursuant to HRS § 571–48. Although we agree with the DHS that the family court did not have the discretion to award temporary *legal* custody, we believe that the court actually awarded temporary *foster* custody and that such an award was not an abuse of discretion. In order to clarify the distinction we make, a review of the relevant provisions of HRS chapters 571 and 587 is necessary. Although the two provisions are clearly designed to meet, and are ostensibly concerned with remedying, different needs of the children of Hawai'i, the present case illustrates how matters before the family court, in the words of Judge Uale, "flip flop back and forth from 571 to 587[.]" It is, therefore, essential to understand HRS chapters 571 and 587 and how they interact.

### 1. HRS Chapter 571

Chapter 571 delineates the family court's jurisdiction, powers, and procedures with regard to juvenile proceedings. Its construction and purpose is set out as follows:

[Chapter 571] shall be liberally construed to the end that children and families whose rights and well-being are jeop-

ardized shall be assisted and protected, and secured in those rights through action by the court; that the court may formulate a plan adapted to the requirements of the child and the child's family and the necessary protection of the community, and may utilize all state and community resources to the extent possible in its implementation.

This chapter creates within this State a system of family courts and it shall be a policy and purpose of said courts to promote the reconciliation of distressed juveniles with their families, foster the rehabilitation of juveniles in difficulty, render appropriate punishment to offenders, and reduce juvenile delinquency.

HRS § 571–1 (1993).

The jurisdiction of the family court over minors is set forth in HRS § 571–11 (1993), which provides in relevant part:

**Jurisdiction; children.** Except as otherwise provided in this chapter, the court shall have exclusive original jurisdiction in proceedings:

(1) Concerning any person who is alleged to have committed an act prior to achieving eighteen years of age which would constitute a violation or attempted violation of any federal, state, or local law or municipal ordinance. Regardless of where the violation occurred, jurisdiction may be taken by the court of the circuit where the person resides, is living, or is found, or in which the offense is alleged to have occurred.

(2) Concerning any child living or found within the circuit:

(A) Who is neglected as to or deprived of educational services because of the failure of any person or agency to exercise that degree of care for which it is legally responsible;

(B) Who is beyond the control of the child's parent or other custodian or whose behavior is injurious to the child's own or others' welfare;

(C) Who is neither attending school nor receiving educational services required by law whether through the child's own misbehavior or nonattendance or otherwise; or

(D) Who is in violation of curfew.

. . . .

(9) *For the protection of any child under chapter 587.*

(Emphasis added.)

Once the court obtains jurisdiction over a minor, that jurisdiction may be retained "after the minor becomes eighteen years of age until the full term for which any order entered shall have expired." HRS § 571–13 (1993). Additionally, in the case of minors alleged to have committed an offense that brings them within the purview of HRS § 571–11 prior to reaching eighteen years of age, the court may retain jurisdiction "after the person becomes eighteen for the purpose of holding hearings and/or entering orders of disposition concerning the alleged offenses." *Id.*

An action is initiated under HRS §§ 571–11(1) or -11(2) by the filing of a petition. HRS § 571–21 (1993). Once that petition is filed, the court has the power to provide for the temporary placement of the child, if necessary, until the child is adjudicated. "Detention, shelter, and release" of minors *"believed to come within* [but not adjudicated under] section 571–11" are dealt with in HRS §§ 571–31 through –33. HRS § 571–32 (1993) (emphasis added). HRS § 571–32 governs the retention and release of minors from juvenile detention facilities and provides in relevant part:

If the court determines that the child requires care away from the child's own home but does not require secure physical restriction, the child shall be given temporary care in any available nonsecure child caring institution, foster family home, or other shelter facility.

. . . Where it is deemed in the best interests of the child . . . the judge may order the child held in the facility subject to further order or placed in some other appropriate facility.

Thus, even though a minor has not yet been *adjudicated* under HRS § 571–11, section 571–32 grants the family court power to place children in various types of facilities, if

such placement is "in the best interests of the child."

HRS § 571–48 (1993), like HRS § 571–32, provides for the placement of children under the jurisdiction of the family court and provides in relevant part:

When a minor is *found by the court to come within section 571–11*, the court shall so decree and in its decree shall make a finding of the facts upon which the court exercises its jurisdiction over the minor. Upon the decree the court, by order duly entered, shall proceed as follows:

. . . .

(2) As to *a child adjudicated under section 571–11(2):*

. . . .

(B) The court *may vest legal custody of the child,* after prior consultation with the agency or institution, *in a local governmental agency* or institution licensed or approved by the State to care for children[.]

(Emphases added.)

█ The DHS argues that HRS § 571–48, which the family court relied upon in awarding to the DHS legal custody of the Minor, only empowers the family court to do so *after* a minor is adjudicated under HRS § 571–11(2). We agree.

█ HRS § 571–48 deals with minors who are "found by the court to come within section 571–11." Section 571–48, however, must be viewed *in pari materia* with HRS §§ 571–31 and –32. *See* HRS § 1–16 (1993) ("Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other."). HRS § 571–31 (1993) allows a police officer to take a minor into custody, if "reasonable grounds [exist] *to believe* that a child comes within section 571–11." (Emphasis added.) HRS § 571–32 provides for detention, shelter, and release of minors who are "*believed* to come within section 571–11." (Emphasis added.) HRS § 571–48, on the other hand, makes explicit in subsections (1) and (2) that, in order for this section to apply, a child must have been *adjudicated* under sections 571–11(1) or –11(2). Under a plain reading of each of these statutes, it is clear that the legislature

intended that the phrase "found by the court to come within," HRS § 571–48, have a different meaning than "believe that a child comes within," HRS § 571–31, or "believed to come within." HRS § 571–32. We therefore conclude that section 571–48 applies only to minors actually adjudicated under section 571–11 and that placement of a minor, prior to adjudication, is dealt with under HRS § 571–32. In the present case, because the runaway petition filed against the Minor had not yet been adjudicated, we hold that the family court was without discretion to award legal custody of the Minor to the DHS pursuant to HRS § 571–48.

### 2. HRS Chapter 587

HRS § 587–1 (1993) sets forth the purpose and construction of the Child Protective Act and states:

This chapter creates within the jurisdiction of the family court a child protective act in order to safeguard, treat, and provide service and permanent plans for children who have been harmed or are threatened with harm.

The legislature finds that children deserve and require competent, responsible parenting and safe, secure, loving, and nurturing homes. The legislature finds that children who have been harmed or are threatened with harm are less likely than other children to realize their full educational, vocational, and emotional potential, and become lawabiding, productive, self-sufficient citizens, and are more likely to become involved with the mental health system, the juvenile justice system, or the criminal justice system, as well as become an economic burden on the State. The legislature finds that prompt identification, reporting, investigation, services, treatment, adjudication, and disposition of cases involving children who have been harmed or are threatened with harm are in the children's, their families', and society's best interests because the children are defenseless, exploitable, and vulnerable.

The policy and purpose of this chapter is to provide children with prompt and ample protection from the harms detailed herein, with an opportunity for timely reconcilia-

tion with their families where practicable, and with timely and appropriate service or permanent plans so they may develop and mature into responsible, self-sufficient, lawabiding citizens.... Every reasonable opportunity should be provided to help the child's legal custodian to succeed in remedying the problems which put the child at substantial risk of being harmed in the family home....

This chapter shall be liberally construed to serve the best interests of the children and the purposes set out in this chapter.

In furtherance of its purpose, the Act has structured guidelines for, *inter alia*, investigating child abuse, providing protective custody, filing petitions with the court, appointing a guardian ad litem, and providing for foster custody. The framework established by the legislature in chapter 587 envisions the filing of a petition to engage the courts in the protection of a child. HRS § 587–31 (1993) states in relevant part:

> **Petition.** (a) A petition invoking the jurisdiction of the court under this chapter shall be filed in the manner provided in this section:
>
> (1) Petitions shall be entitled "In the Interest of _____, born on _____." and shall be verified and shall set forth:
>
>> (A) A concise statement of the basis for the allegation of the harm or threatened harm which brings the child within this chapter;
>>
>> (B) The name, birthdate, sex, and residence address of the child;
>>
>> (C) The names and last known residence addresses of the member or members of the child's family required to be notified pursuant to section 587–32(a), and other persons who are to be made parties to the child protective proceedings at the time of the filing of the petition pursuant to section 587–32(a); and
>>
>> (D) Whether the child is under the temporary foster custody of the depart-

ment in foster care, and, if so, the type and nature of the foster care, the circumstances necessitating the care, and the date the child was placed in the temporary foster custody; and

> (2) The petition shall state when any of the facts required by this section cannot be determined. The petition may be based on information and belief but in that case the petition shall state the basis of the information and belief.
>
> (b) The petition shall state that unless the family is willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, their respective parental and custodial duties and rights shall be subject to termination.
>
> (c) The court shall review each petition under this chapter and if, in the discretion of the court, the child is in a circumstance or condition that the child's continuing in the custody or care of the child's family presents a situation of imminent harm to the child, the court shall order that a police officer immediately take the child into protective custody and that the department[8] immediately assume temporary foster custody.

The DHS asserts that this petition is mandatory in every situation and that, therefore, a chapter 587 action cannot proceed unless a petition is filed. We disagree.

Although we recognize that HRS § 587–31 states that "[a] petition invoking the jurisdiction of the court under this chapter *shall* be filed in the manner provided in this section" (emphasis added),

> we have long subscribed to the view that [t]he use of the word "shall" in [a] statute is not dispositive of the issue ... whether the statute is mandatory rather than directory. While the word "shall" is generally regarded as mandatory, in certain situations it may properly be given a directory meaning. In determining whether a statute is mandatory or directory[,] the intention of the legislature

---

8. Pursuant to HRS § 587–2 (1993), "department" means "the department of human services and its authorized representatives."

must be ascertained. The legislative intent may be determined from a consideration of the entire act, its nature, its object, and the consequences that would result from construing it one way or the other. In general, a statute is directory rather than mandatory if the provisions of the statute do not relate to the essence of the thing to be done or where no substantial rights depend on compliance with the particular provisions and no injury can result from ignoring them.

*State v. Toyomura,* 80 Hawai'i 8, 19–20, 904 P.2d 893, 904–05 (1995) (quoting *Jack Endo Elec., Inc. v. Lear Siegler, Inc.,* 59 Haw. 612, 616–17, 585 P.2d 1265, 1269 (1978) (citations, internal quotation marks, and ellipses points omitted)).

The text of HRS § 587–31 indicates three basic purposes of the section. The first, set forth in subsection (a), is to gather for the court information that essentially consists of a concise statement of the predicate facts and cursory biographical information about the minor, the minor's parent (or legal guardian), and the minor's foster guardian, if any. This is clearly intended to facilitate the court's decision-making. The second purpose, set forth in subsection (b), is to provide for the inclusion in the petition of notice to a minor's family of possible termination of parental and custodial rights and duties. This is clearly intended to put interested parental parties on notice of the gravity of the proceedings.[9] The third purpose, set forth in subsection (c), is to provide for family court review of the information contained in the petition and, if necessary, to order police protective custody or to award the DHS temporary foster custody of the minor. This provision merely empowers the court to act in whatever manner is necessary to further the purposes of the Child Protective Act.

The ascendant purpose of the Child Protective Act is, rather redundantly, the protection of children. To construe the petition requirement of HRS § 587–31 as mandatory would significantly restrict the flexibility of the family court to respond appropriately to the varied circumstances of domestic situations. If the petition requirement were mandatory, the family court would be delayed in taking appropriate action when, as happened in the present case, a minor appears before the court on a chapter 571 petition and chapter 587 issues arise. Such a result certainly does not comport with the clear legislative mandate to provide "prompt and ample" protection to children, especially when all of the information required by a chapter 587 petition is already before the court.

Furthermore, HRS § 587–31 was not intended to confer any benefit or right on *the DHS,* and the DHS suffers no disadvantage by the absence of a formal chapter 587 petition in a family court proceeding; no "advantage is lost," "no right is destroyed," and no "benefit is sacrificed." *Toyomura,* 80 Hawai'i at 20, 904 P.2d at 905. On the contrary, the clear purpose of the "petition requirement" is to place the parent on notice of possible termination of parental rights; no purpose is discernible on the face of section 587–31 intending to further any "right" of the DHS. Thus, if the family court has the information necessary to make a decision on a chapter 587 issue, even in the absence of the formal petition outlined in HRS § 587–31, we hold that the court may still exercise its powers under HRS § 587–31(c).

### 3. Interaction Between Chapters 571 and 587

Both statutory schemes have as their essential purpose the protection of the children of Hawai'i. It would be absurd, therefore, to construe either chapter as implicitly limiting the ability of the family court to proceed

9. Because we hold that the family court awarded the DHS "temporary foster custody" of the Minor and not "temporary legal custody," *see* section II.C.5., *infra,* and that therefore the parental rights of the Minor's father were not terminated, we need not address the issue of parental rights termination procedures that are raised by the DHS. Furthermore, we also need not address the constitutional implications of not fully complying with any parental rights termination procedures raised by the DHS because we question its standing to raise such arguments. These procedures are meant to protect the rights of *parents* in the event of any alleged violation and not the state. Insofar as the Minor's father is not alleging any violation, we do not believe the DHS has standing to raise the arguments in his place.

under the other chapter. *See* HRS § 1–15(3) (1993) ("Every construction which leads to absurdity shall be rejected."). It is entirely plausible that, in investigating and seeking to resolve chapter 571 issues dealing with runaways and juvenile delinquents, the family court may unearth evidence indicating that the minor may need protection from abuse under chapter 587.

■ Simply because an action is initiated as a chapter 571 proceeding should not preclude or limit the family court from addressing problems perceived as arising under chapter 587. The DHS urges this court to hold that the family court was restrained by the procedural and remedial provisions of chapter 587 in addressing the Minor's situation. We disagree. When the family court is concerned about the potential abuse of a minor, we hold that it may take action under chapter 587 to promptly and amply address the problem, regardless of whether the action was initiated under chapter 571 or by way of a formal chapter 587 petition.[10]

4. **Although the family court did not abuse its discretion by placing the Minor with the Pakele family, the court could not award the Pakeles custody of the minor under HRS § 571–48 prior to her adjudication under HRS § 571–11(2).**

As previously indicated, the family court awarded temporary foster custody of the Minor to Jensen Pakele at the February 2, 1994 hearing. At the same hearing, the Minor's counsel requested that the "DHS become involved in the case and that ... [it] be ordered to be temporary legal guardian of the minor. But in the meantime[, the Minor's counsel] ask[ed] that Mr. Pakele have custody or supervision over [the Minor] and that she ... continue to reside with him on the Big Island."

The family court informed the Minor's father that it was not a "viable option" for his daughter to return home. The court also informed the Minor's father that she could not be sent to a detention home, as her

father had requested, because "it's against the law[;] I don't have the legal authority right now based upon her situation to order her into secure lock-up."

The family court clearly believed that the Minor "require[d] care away from the child's own home," and thus, the placement of the Minor with the Pakeles could have been justified under HRS § 571–32. *See* section II. C.1., *supra.* HRS § 571–2 (1993) defines "shelter" as "the temporary care of children in physically unrestricting facilities pending court disposition." The Pakeles' home, therefore, satisfies the statutory definition of "shelter" under HRS § 571–32, and the DHS has not made any arguments to the contrary. Thus, we believe that the court's order allowing the Minor to reside with the Pakeles on the Big Island was within the court's power and discretion.

The DHS further challenges the family court's decision to award temporary legal custody of the Minor to the DHS, arguing that it could not have been awarded any form of "legal custody" because the family court, not the DHS, took "responsibility of physical possession" of the Minor when it placed her with Jensen Pakele on the Big Island.

At the June 15, 1994 hearing, the family court clarified its action at the February 2, 1994 hearing, stating that the court "went with what was available in th[e] [c]ourtroom.... [W]hy didn't you [ (referring to the DHS) ] come back right away and say, hey, we have problems with this, this doesn't quite fit, we want the responsibility to leave her here and work—you folks say you wanted to work the reunification, what did you—what has the Department done."

Indeed, the DHS could have sought clarification of its rights and obligations under the family court's custody award. The DHS could also have petitioned the family court to move the Minor from the Pakele home on the Big Island to her father's home or a foster home on O'ahu. Instead, the DHS took no action to assert the placement rights that it acquired as temporary custodian of the Mi-

---

10. Of course, a formal petition should be filed whenever practicable. However, regardless whether a formal petition is filed, the family court should proceed only when the court is satisfied that it has all the necessary information to address the circumstances of the child.

nor. On appeal, the DHS claims that it did not have the rights to exercise. This argument begs the question. Had the DHS tried to move the Minor and been thwarted by the court, perhaps its position would be supportable. Having taken no action to assert placement rights, however, it cannot now claim that it was denied the exercise of those rights.

The DHS's inaction runs completely contrary to one of its primary duties, that is, "plac[ing], or cooperat[ing] in placing, neglected children[11] in suitable private homes or institutions[.]" HRS § 346–14(4) (1993). The court found that the Minor's return to her father's home was not a viable option, which is tantamount to a finding that the home was unsafe. The DHS, thus, had a responsibility (which it clearly shirked) to help place the Minor in a "suitable" home or institution.

However, HRS § 571–32 does not authorize the family court to make custody awards. Nonetheless, the family court obviously intended to convey some form of custody, which it termed temporary "legal" custody, and premised its custody award on the application of HRS § 571–48. *See* section II.C.1., *supra*. However, as indicated above, the Minor was not adjudicated a runaway under HRS § 571–11(2) until December 21, 1994. Thus, HRS § 571–48 was inapplicable at the time; the family court could not invoke HRS § 571–48 as the basis of its February 2, 1994 order awarding temporary "legal" custody of the Minor to the DHS. The DHS was not legally responsible under HRS § 571–48 to pay the costs associated with the Minor's care.

The DHS argues that no category of temporary "legal" custody exists insofar as none is defined in the statutes. We need not determine whether such a category exists, however, because it is clear that the family court intended to vest some responsibility in the DHS for the welfare of the Minor in this case. We believe, as discussed below, that the family court actually intended to vest the DHS with temporary "foster" custody, which was manifestly within its power under chapter 587.

5. **The family court had the power to award the DHS temporary foster custody of the Minor under HRS chapter 587.**

The GAL contends that the present action became, in essence, a "quasi–587 proceeding." The family court, in fact, referred to the proceeding as "a typical 587 situation"[12] and noted that "these cases flip flop back and forth from 571 to 587 and we have to learn to live with it. That's the way it is."[13] We agree that, when the court became concerned about the safety of returning the Minor to her father's home, the issues arising under chapter 587 became implicated.

Although no chapter 587 petition had been filed, the family court had at its disposal all of the information contemplated by the formal petition described in HRS § 587–31. Information regarding the Minor's name, birthdate, and residence address, as well as her father's residence address, were all contained in the chapter 571 petition. The court also spoke with the Minor, the Minor's father, Mr. Pakele, and the Minor's GAL in chambers as well as in the courtroom. The court was not only aware of the circumstances surrounding the Minor's alienation from her

---

11. HRS § 346–1 (1993) defines a "neglected child" as
 any minor who for any reason is homeless or abandoned or is receiving inadequate parental care or guardianship, or whose home, by reason of cruelty, neglect, or depravity on the part of the minor's parents, guardian, or other person in whose care the minor may be, is an unfit place for the child.

12. Specifically, the court stated that "what it looks like to me is that there [sic] harm, immediate and [sic] harm within the next ninety days, this is a typical 587 situation."

13. Even though the family court "has to learn to live with" cases that "flip-flop back and forth from 571 to 587," this vacillation obviously causes confusion for the court. The court stated on June 15, 1994 that the present action was a "[q]uasi 587 proceeding"; two months later, in findings entered on August 3, 1994, the court found that the order of February 2, 1994 gave custody of the Minor to DHS pursuant to HRS § 571–48.

home, but, as previously discussed, had before it substantial evidence that the home of the Minor's father was unsafe. *See* section II.B., *supra.* Therefore, the family court properly acted in the best interests of the Minor under chapter 587.

Under HRS § 587–31(c), once the court determines that a child is in a "situation of imminent harm," the child may be taken into protective custody and "the department [*i.e.* the DHS shall] immediately assume temporary *foster* custody." (Emphasis added.) Thus, the family court had the power and discretion to award temporary *foster* custody of the Minor to the DHS.

"Foster custody" is defined as the "legal status created pursuant to [HRS § 587–2,] section 587–21(b)(2), or by any order of the court after the court has determined that the child's family is not presently willing and able to provide the child with a safe family home[.]" HRS § 587–2 (1993). HRS § 587–2 further provides in relevant part:

(1) Foster custody vests in a foster custodian the following duties and rights:

(A) To determine where and with whom the child shall be placed in foster care;
. . .
(B) To assure that the child is provided in a timely manner with adequate food, clothing, shelter, psychological care, physical care, medical care, supervision, and other necessities;

(C) To monitor the provision to the child of appropriate education[.]

In its May 16, 1994 order, granting the GAL's motion for cause, the family court ordered the DHS to: (1) make foster board payments to the Pakele family; (2) reimburse the Pakeles for travel, clothing, medical, dental, and other costs associated with the Minor; (3) work with the Department of Education to try to ensure the completion of the Minor's schooling; and (4) reimburse the GAL for travel costs. Although the court referred to its custody award as temporary "legal" custody, the specific orders of the court concerning the DHS's responsibilities for the Minor's care are clearly the responsibilities of a temporary "foster" custodian, as delineated in HRS §§ 587–2(B) and –2(C),

which the family court had the power to order under HRS § 587–31(c).

We therefore hold that the family court's award of temporary "legal" custody, which we view as one of "foster" custody, was not an abuse of discretion.

D. *The DHS Is Responsible, As Temporary Foster Custodian Of The Minor, For The Payment of Costs Relating To The Minor's Care Prior To The Minor's Attaining The Age Of Majority.*

 Finally, the DHS argues that the family court erred when it ordered the DHS to pay foster board payments to Jacob Pakele because Mr. Pakele's home was not a licensed foster home. Although the Pakele home was not licensed as a foster home on February 2, 1994, when the Minor was placed there by the family court, the home was licensed as a foster home in July 1994. There does not seem to be, nor has the DHS offered, any reason why the DHS cannot make foster board payments retroactively.

However, the family court ordered the DHS to continue making foster board payments to the Pakeles for the Minor's placement until December 31, 1994. The DHS argues that, because the Minor turned eighteen on May 22, 1994, it was relieved of any obligation to make foster board payments after her eighteenth birthday. The GAL disagrees, citing to HRS § 571–13 (1993), which provides in relevant part that, "in the case of any person who is alleged to have committed an offense under section 571–11 prior to reaching eighteen years of age, the court shall have jurisdiction after the person becomes eighteen for the purpose of holding hearings and/or entering orders of disposition concerning the alleged offenses." Section 571–13 is inapposite because the family court order that continued foster board payments was entered after the Minor turned eighteen. Once a minor turns eighteen, the family court has jurisdiction only to "hold[ ] hearings and/or enter orders of disposition concerning the alleged offenses." HRS § 571–13.

In further support of his position, the GAL also cites to HRS § 346–17.4 (1993), which provides in relevant part:

**Foster board allowances for students.** (a) Any eligible foster child shall be eligible for foster board allowances after reaching the age of majority and the foster board payments for that person shall be paid to the person's foster parents, provided that:

(1) The person is twenty-one years old or younger; and

(2) The person is attending or has been accepted to attend an accredited institution of higher learning on a full-time basis; and

(3) The person has continued to reside in the foster home wherein the person reached the age of majority, or has continued to be accepted as a member of the foster family and be under the guidance and support of the foster family.

There is no evidence in the record that the Minor was attending or had been accepted into any institution of higher learning. Therefore, HRS § 346–17.4 cannot be invoked to justify the court's order continuing foster board payments beyond the Minor's eighteenth birthday.

Neither the GAL's arguments nor the record before us indicate any justification for continuing foster board payments beyond the Minor's eighteenth birthday. Accordingly, to the extent that the family court's order permitted such payments beyond the Minor's eighteenth birthday, we reverse.

## III. *CONCLUSION*

Based on the foregoing, we hold that: (1) the family court's FOF that the home of the Minor's father was unsafe is not clearly erroneous; and (2) the family court's award of temporary "legal" custody, which we view as an award of "foster" custody, to the DHS was not an abuse of discretion. We therefore affirm the family court's interim orders requiring the DHS to pay for the Minor's care up to her eighteenth birthday. We reverse the order of the family court requiring the DHS to pay foster board payments for periods after the Minor turned eighteen.