93 P.3d 1186

**CHILD SUPPORT ENFORCEMENT AGENCY, State of Hawai'i, Petitioner–Appellee,**

**v.**

**John DOE, Respondent–Appellant**

**and**

**Jane Doe, Respondent–Appellee.**

No. 25236.

Intermediate Court of Appeals of Hawai'i.

June 23, 2004.

Rosemary McShane and Kim Kaeo Daly, Deputies Corporation Counsel, City and County of Honolulu, on the briefs, for Petitioner–Appellee, Child Support Enforcement Agency, State of Hawai'i.

Emlyn H. Higa, on the briefs, for Respondent–Appellant.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by BURNS, C.J.

Respondent–Appellant John Doe (Father) appeals from the June 26, 2002 Judgment of Paternity entered in the Family Court of the First Circuit.[1] We vacate and remand for further proceedings consistent with this opinion.

## BACKGROUND

On January 7, 2002, Petitioner–Appellee Child Support Enforcement Agency, State of Hawai'i (CSEA), filed a Complaint for Establishment of Paternity against Father and Respondent–Appellee Jane Doe (Mother). The complaint alleged that although Mother and

---

1. Judge Karen M. Radius presiding.

Father were not married to each other, they were the parents of a daughter born on August 10, 1996 [2] (Child).

At an April 5, 2002 hearing, both Mother and Father admitted Father's paternity of Child. On May 8, 2002, after meeting separately with Mother and Father, a family court social worker (the social worker) submitted a Status Report/Recommendation to the court. Issues regarding custody, visitation, child support, past child support, birth-related medical expenses, and health insurance coverage were continued until trial.

On May 29, 2002, CSEA filed a Position Statement addressing issues of past and current child support, birth-related medical expenses owed to the State of Hawai'i Department of Human Services (DHS), and health insurance coverage for Child. CSEA alleged that "[t]he Child received monetary welfare benefits from DHS" and argued that "[p]ast due child support should be calculated based on the [Child Support Guidelines Worksheet][.]"

On June 26, 2002, after a trial on June 12, 2002, the court entered a Judgment of Paternity that (1) decided that Father is the natural father of Child, (2) awarded legal and physical custody of Child to Mother, (3) ordered Father to pay child support of $830 per month for Child commencing July 2002,[3] (4) decided that Father owed DHS $830 per month child support for November 2001 through June 2002, (5) ordered Father to pay DHS $6,640 (8 × $830) at the rate of $10 per month,[4] (6) allocated responsibility between Father and Mother for payment of Child's medical and dental expenses,[5] and (7) specified Father's rights of child visitation.

On September 23, 2002, the family court filed its Findings of Fact and Conclusions of Law (FsOF and CsOL). With the FsOF and

CsOL challenged by Father in this appeal outlined in bold print, the FsOF and CsOL state, in relevant part, as follows:

The court, having considered the evidence admitted at trial, the testimony of the witnesses, and all of the records and file herein, hereby makes the following findings of fact and conclusions of law:

## *FINDINGS OF FACT*

. . . .

**9. Mother and Father lived together until January 2000 when Mother moved . . . with [Child].**

**10. Mother and Father had an off-and-on relationship for nine (9) years. At times Mother would leave the couples' [sic] home but would take [Child] to Father's home to go to school with another child who lived there.**

. . . .

**14. Mother began receiving cash assistance on behalf of [Child] from the Welfare Division, Department of Human Services, State of Hawaii (hereinafter "DHS") in November 2001, while she was unemployed and Father was no longer supporting her and [Child].**

. . . .

**18. Father denied any additional income despite Mother's claim that Father rented out a portion of his four bedroom home to friends of Father's, [collectively, the Friends, or individually, Mr. D or Mrs. D].**

**19.** [The Friends and their son] reside with Father in the house owned by Father.

**20.** [The Friends] and Father had an agreement that they would pay the entire

---

2. The complaint filed by Child Support Enforcement Agency (CSEA) states that Child was born on September 10, 1995. Later, in its position statement, CSEA states that Child was born on August 10, 1986. Child's birth certificate indicates that she was actually born on August 10, 1996.

3. This amount was based on the $997 monthly gross income attributable to Mother and the $7,369 monthly gross income attributable to Father.

4. At that rate, without interest, payment will take 664 months or more than fifty-five (55) years.

5. The judgment noted that Child was covered by an insurance plan provided by Father, ordered Mother to pay the first $500 of Child's unreimbursed ordinary and extraordinary medical and dental expenses, and ordered that both parents are "equally responsible" for amounts in excess of $500.

mortgage one month and the entire utilities the next month.

21. Father would pay the mortgage during the month [the Friends] paid utilities, and the utilities the month [the Friends] paid the mortgage. [The Friends paid] $1250.00 toward Father's mortgage every other month, and between $240 and $280 every other month for utilities.

22. **Father's testimony that [the Friends'] payments are not in the nature of rent is not credible.**

. . . .

26. Father's rental income is imputed at $745 monthly, or $1250 in mortgage payment plus $240 in utilities, divided by two as it is paid every other month by [the Friends].

. . . .

30. **Father did not provide any regular financial support for [Child] from the period November 2001 to [June 2002], but did provide some financial support in the prior period.**

. . . .

32. Father's testimony regarding his involvement with [Child] and his availability to care for and provide day to day supervision including before and after school was not credible given Father's work demands.

33. **Father's testimony as [to] when [Child] lived with him was disingenuous at best.**

## CONCLUSIONS OF LAW

. . . .

2. *Paternity.* The material allegations of the Complaint for Paternity have been proven and Father is the biological and legal father of [Child].

. . . .

5. *Child Support.* Child Support must be calculated pursuant to the existing child support guidelines, which are the 1998 Amended Child Support Guidelines (hereinafter "CSGW") instructions. Father's wages and his receipt of monies from people sharing his home are regular and consistent and reduce personal living expenses. Father's income for child support purposes includes the money he receives for mortgage and utilities, as this is in the nature of rental income to him. Father's rental income shall be imputed at $745 monthly. Father's monthly gross income for the purposes of child support is $7369. Mother's monthly income is imputed at $997.

Based upon the CSGW including giving Father $288 credit for the medical/health/dental insurance payments, Father shall pay child support of $830 monthly.

6. *Past due child support owing to DHS.* **Father's past child support owing to the DHS is $6,640, or 8 months at $830 monthly, to be liquidated at $10 monthly in addition to current child support.**

Father filed a notice of appeal on July 26, 2002. The appeal was assigned to this court on May 6, 2003.

## POINTS ON APPEAL

Father asks this court to "vacate the judgment against him as to amounts owing to [DHS]" because the family court was clearly erroneous in finding that:

1. Mother and Child moved out of Father's home in January 2000; and

2. Father lied about the rent.

## THE RELEVANT STATUTES

The Hawaii Revised Statutes (HRS) (Supp. 2003) state in relevant part:

§ 346–37.1 **Payment of public assistance for child requires payment of child support to [DHS] by natural or adoptive parents.** (a) Any payment of public assistance money made to or for the benefit of any dependent child or children creates a debt due and owing to [DHS] by the natural or adoptive parent or parents who are responsible for support of such children except that debts under this section shall not be incurred by a parent or other person who is the recipient of public assistance moneys for the benefit of minor dependent children for the period such person or persons are in such status, and,

provided that where there has been a family court order, the debt shall be limited to the amount provided for by the order.

(b) If there is no existing court order, the debt for a period during which public assistance was provided to the child or children may be established by agreement of the parties or application of the child support guidelines established pursuant to section 576D-7.

§ 346-37.2 **Department subrogated to rights.** [DHS] shall be subrogated to the right of such child or children or person having the care, custody, and control of such child or children to the debt created under section 346-37.1. Any judicial or administrative action to collect the debt for [DHS] shall be undertaken by the [CSEA] under chapter 576D.

§ 346-37.3 **Notice of child support debt.** [DHS] shall notify the [CSEA] of the amount of, and the periods during which, public assistance was provided to or for the benefit of any dependent child or children.

§ 576D-8 **Transmittal of money collected to [DHS].** The moneys collected by the [CSEA] on behalf of [DHS] shall be transmitted to [DHS] as required by Title IV-D of the Social Security Act.

§ 576D-10 **Collection and disbursal of child support; direct payment exception.** (a) The [CSEA] shall collect and disburse child support payments when an order requires the collection and disbursal. In the event of any default by the obligor, upon notification of the default by the custodial parent, the [CSEA] shall proceed against the obligor for the arrearage and the [CSEA] shall have jurisdiction over future child support payments. Notwithstanding any other law to the contrary, the [CSEA] shall maintain a special interest bearing account for child support payments. Moneys collected by the [CSEA] for child support payments shall not be deposited into the state treasury, but shall be deposited into this account. Moneys to be disbursed by the [CSEA] for child support payments shall be disbursed from this account without appropriation or allotment.

The interest realized from this account shall be used:

(1) For related costs of the maintenance and operation of the account; and

(2) To improve the [CSEA's] ability to promptly disburse payments to the custodial parent.

The balance shall be deposited into the state treasury to the credit of the general fund.

(b) Any child support payments required by a court order effective on June 30, 1986, to be made to a court or clerk of the court and disbursed to a custodial parent shall be made to the [CSEA] after June 30, 1986. The [CSEA] shall disburse the payments as appropriate under the court order.

(c) At the time a child support obligation is first established or at any time thereafter, the court may approve an alternative arrangement for the direct payment of child support from the obligor to the custodial parent as an exception to the provisions for income withholding through the [CSEA], as required by sections 571-52.2(a)(1), 571-52.3, and 576E-16(a).

. . . .

(g) No alternative arrangement for direct payment shall be approved where the obligor or the custodial parent is receiving services under Title IV-D or where the dependents of the obligor receive public assistance, including but not limited to public assistance from the [DHS] under chapter 346, foster care under section 571-48, Title IV-E or Title XIX of the federal Social Security Act (42 U.S.C. § 1396), or where the obligor owes child support for a period during which public assistance was provided to the child or children by [DHS].

. . . .

(j) The [CSEA] shall not be required to maintain records while an order obtained pursuant to this section is in effect, except for any payments received and disbursed by the [CSEA].

§ 576D-10.5 **Liens.** (a) Whenever any obligor through judicial or administrative process in this State or any other state has been ordered to pay an allowance for the

support, maintenance, or education of a child, or for the support and maintenance of a spouse or former spouse in conjunction with child support, and the obligor becomes delinquent in those payments, a lien shall arise on the obligor's real and personal property and the obligor's real and personal property shall be subject to foreclosure, distraint, seizure, and sale, or notice to withhold and deliver, which shall be executed in accordance with this section or applicable state law. No judicial notice or hearing shall be necessary prior to creation of such a lien.

(b) Upon the establishment of an order of support for a prior period, a lien shall arise on the obligor's real and personal property and the obligor's real and personal property shall be subject to foreclosure, distraint, seizure, and sale, or notice to withhold and deliver, which shall be executed in accordance with this section or applicable state law. No judicial notice or hearing shall be necessary prior to creation of such a lien.

(c) Every order or judgment regarding child support filed in judicial or administrative proceedings in this State shall be recorded in the bureau of conveyances. An order or judgment regarding child support filed in judicial or administrative proceedings of any other state may be recorded in the bureau of conveyances. This recorded lien shall be deemed, at such time, for all purposes and without any further action, to procure a lien on land registered in the land court under chapter 501. The statutory lien becomes effective when it arises under subsection (a) or (b) and shall attach to all interests in real or personal property then owned or subsequently acquired by the obligor including any interests not recorded with the bureau of conveyances or filed in the land court.

(d) No fee shall be charged the [CSEA] or its designated counsel for recording or filing of the liens provided for in this section or for the recording or filing of any releases requested in conjunction with the liens.

(e) A recorded order or judgment regarding child support or public assistance debt becomes effective and takes priority from the time it is recorded or the time the child support obligation described therein becomes delinquent, whichever is later. A statutory lien that is provided for by and becomes effective under this section shall take priority over any unrecorded lien whenever acquired, except tax liens previously acquired.

. . . .

(i) If there is a dispute between the obligor and the [CSEA] concerning the amount of the child support lien, the obligor may request in writing an account review. Upon receipt of a written request, the [CSEA] shall conduct a review of the obligor's account balance pursuant to its administrative rules.

(j) Any person or entity failing to satisfy a notice of child support lien as required by this section, even though able to do so, shall be personally liable to the [CSEA] or the obligee for the full amount of all sums required to be withheld and delivered.

The following statute pertains only to paternity proceedings:

**HRS § 584–15 Judgment or order.** (a) The judgment or order of the court determining the existence or nonexistence of the parent and child relationship shall be determinative for all purposes.

. . . .

(c) The judgment or order may contain any other provision directed against the appropriate party to the proceeding, concerning the duty of support, . . . . The court may further order the noncustodial parent to reimburse . . . any public agency for reasonable expenses incurred prior to entry of judgment, including support, maintenance . . . expended for the benefit of the child.

. . . .

(e) In determining the amount to be paid by a parent for support of the child and the period during which the duty of support is owed, a court enforcing the obligation of support shall use the guidelines established under section 576D–7.

## STANDARDS OF REVIEW

Findings of fact are reviewed under the "clearly erroneous" standard. *In re Doe*, 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996) (citations omitted). "A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is left with a definite and firm conviction that a mistake has been made." *State v. Balberdi*, 90 Hawai'i 16, 20–21, 975 P.2d 773, 777–78 (1999) (citations omitted). Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Roxas v. Marcos*, 89 Hawai'i 91, 116, 969 P.2d 1209, 1234 (1998) (quoting *Kawamata Farms v. United Agri Products*, 86 Hawai'i 214, 253, 948 P.2d 1055, 1094 (1997) (citations, internal quotation marks, and original brackets omitted)).

Conclusions of law are reviewed *de novo* under the right/wrong standard. *In re Doe*, 84 Hawai'i at 46, 928 P.2d at 888 (citations omitted).

The interpretation of a statute is a question of law that we review *de novo*. Similarly, a trial court's conclusions of law are reviewable *de novo* under the right/wrong standard. Under the *de novo* standard, this court must examine the facts and answer the pertinent question of law without being required to give any weight or deference to the trial court's answer to the question. In other words, we are free to review a trial court's conclusion of law for its correctness.

*State v. Kelekolio*, 94 Hawai'i 354, 356, 14 P.3d 364, 366 (Haw.App.2000) (citations omitted).

The Hawai'i Supreme Court has repeatedly stated that, when interpreting a statute, an appellate court's "foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And where the language of the statute is plain and unambiguous, [a court's] only duty is to give effect to the [the statute's] plain and obvious meaning." *State v. Wells*, 78 Hawai'i 373, 376, 894 P.2d 70, 73 (1995) (internal quotation marks, citations, and brackets in original omitted). Accordingly,

we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

... This court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it to discover its true meaning. Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another.

*State v. Rauch*, 94 Hawai'i 315, 322, 13 P.3d 324, 331 (2000) (internal quotation marks, citations, ellipses, and brackets and block quote format omitted) (quoting *State v. Kotis*, 91 Hawai'i 319, 327, 984 P.2d 78, 86 (1999)).

## DISCUSSION

### 1.

Father challenges FOF no. 33, COL no. 6, and the part of the June 26, 2002 Judgment of Paternity ordering him to reimburse DHS $6,640 for public assistance provided to Mother on behalf of Child for the eight months commencing November 2001 through June 2002 (the Relevant Eight Months).

### A.

Father introduced evidence that Mother and Child did not move out of his home until April 5, 2002. Father asserts that, until the

April 5, 2002 hearing, (1) Mother and Child lived with him and he provided financial support for Child, and (2) he was unaware that Mother had been receiving welfare benefits from DHS. Since a noncustodial parent's obligation to DHS for public assistance money paid to, or for the benefit of, a dependent child presupposes that the noncustodial parent has not already satisfied his or her duty to support the subject child, Father argues that he should not be required to reimburse DHS for public assistance money received by Mother during the part of the Relevant Eight Months when he satisfied his duty to support Child.

Father asks this court to "vacate the judgment against him as to amounts owing to [DHS]." Thus, this case and this appeal are concerned only with (1) the amount of child support payable by Father for the Relevant Eight Months, as calculated pursuant to the guidelines established under HRS § 576D–7; (2) the amount of Father's payments, if any, for Child's expenses that should be credited against Father's child support obligation for the Relevant Eight Months; and (3)(a) the amount of HRS § 346–37.1 "public assistance money" paid by DHS "to or for the benefit of" Child for the Relevant Eight Months, and (b) the HRS § 584–15(c) "reasonable expenses incurred [by DHS] prior to entry of judgment, including support, maintenance ... expended for the benefit of" Child. It follows that FsOF nos. 9 and 10 are not relevant to this appeal.

### B.

■ In contrast to Father's assertion that Mother and Child lived with him until April 5, 2002, FsOF nos. 14, 30, and 33 state, in relevant part, as follows:

14. Mother began receiving cash assistance on behalf of [Child] from [DHS] in November 2001, while she was unemployed and Father was no longer supporting her and [Child].

30. Father did not provide any regular financial support for [Child] from the period November 2001 to [June 2002], but did provide some financial support in the prior period.

33. Father's testimony as [to] when [Child] lived with him was disingenuous at best.

Father contends that FsOF nos. 14, 30, and 33 are clearly erroneous. We disagree.

The following colloquy occurred pre-trial, during the April 5, 2002 hearing:

THE COURT: All right. And where does [Child] sleep—how many nights a week does she sleep over night at your house?

[FATHER]: Seven.

[MOTHER]: I'm there too.

THE COURT: Oh, you're living in the same house with him?

[MOTHER]: Yeah.

. . . .

[FATHER]: [Mother] has a [different] address.

. . . .

[MOTHER]: I have a resident address at [a different place].

THE COURT: Okay. But ... you agree, [Father], that [Mother] lives in your household?

[FATHER]: She's been there only because she's providing some child care for me.... For the last five years, she's been telling me, She's [sic] yours. You keep her. If we have minor disagreements, whatever, she would leave and I've been—

. . . .

[FATHER]:—having this child.

THE COURT: So, [Father], you're looking for an order that you get custody; and, [Mother], you're looking for an order that you have custody so in case you don't live together there's a clear—

[MOTHER]: Yeah, right. [Child] living with him is like—she's—

[COUNSEL FOR THE CSEA]: Your Honor, there's an additional issue. There appears to be Welfare fraud because [Father's] not on the Welfare budget. And if they're living together, then she's not reporting him in the household.

[MOTHER]: Well, I'm not living together. I'm just, you know, helping taking care of [Child] so she goes to ... school.

And so my caseworker says, you know, Don't [sic] cancel, you know, for the child support. So I'm able to get help until like—if we get married, then, you know, cancel. But even if like we live together and stuff like that, do not cancel child support.

. . . .

THE COURT: Child support meaning Welfare benefits?

[MOTHER]: Right.

. . . .

[MOTHER]: . . . I don't want [Child] not to see [Father]. And I don't want to make it ugly or have like cruel intentions. So I would, you know, be at the house and take care of her. You know, have her go to school.

THE COURT: Okay.

[MOTHER]: And my plans is [sic] to leave in June when she gets out of school. Then I want to relocate to the mainland.

At the June 12, 2002 trial, Father testified, in relevant part, as follows:

A. At one time [Mother], her two older children [6]—they all lived with me, okay?

. . . .

A. Well, we came back in February [2000], okay? And [Mother] was staying with me at that time even though her two older children were living at the place where they had moved to. And from that time—see we came back February. My mother's birthday was in May. And during that—from that February all the way till [sic] that May, [Child] was living with me.

As a matter of fact, I took [Child] back to [the mid-west] with me that May for my mother's birthday which was May the 2nd. When I came back from [the mid-west], I was back here a week. My mother passed away, and we turned back around and got right back on the plane. And I took [Mother] with me as well. She went to my mother's funeral. I bought tickets for everybody, okay?

We went to [the mid-west] and we stayed in [the mid-west] until June. We was in [the mid-west] until June sometime. I think the 16th or so, okay? . . . .

Now, when we came back from [the mid-west], I had [Child]. We never saw [Mother] again until October. . . . That's when . . . [Mother] came home with us, and . . . we started hanging out again, you know.

. . . .

Q. So between June of 2000 and October 2000 [Child] lived with you, but [Mother] was absent from the residence?

. . . .

A. That's correct.

Q. . . . [A]fter . . . October 2000 she came back to live in your residence?

A. Yeah. She was—she was basically staying with me again.

Q. Okay. Okay, for how long?

A. . . . I had a business trip to go on April the 29th I believe or the 30th. . . .

. . . .

Okay, prior to leaving for this business trip and one-week vacation, [Mother] asked me for money. I gave her several hundred dollars before I left, okay, to care for [Child] while I was gone. When I came back, [Mother] was gone. I had to find [Child]. One, her—her niece was keeping [Child], okay?

Q. When did you come back?

A. . . . I was gone for a total of like two weeks, okay? When I came back, I had to get [Child] from [Mother's] niece. [Mother] was on the mainland. . . .

Q. Okay. When did [Mother] come back?

A. I believe she came back late June.

Q. And during the period of time that she was gone, you took care of [Child]—

A. That's correct.

Q. —at the residence?

A. At my residence. And [Mother's] mother was providing child care for me at the time. . . .

. . . .

---

**6.** In addition to Child, Mother has two other children, both adults, who are not related to Father.

Q.... Where was [Child] from June 2001 on?

A. She was with me[.]

....

Q. From June 2001, [Child] was with you in your residence continuously until April 5, 2002?

A. That's correct.

....

A.... When [Mother] came back, we talked, got back together again, and I went to pick up [Child]. [Mother] was at her mother's house, and I took them all to dinner. And from that time on—[Mother] came home with us. And from that time on, [Mother] was at my house.

....

Q. Okay. That's from late June 2001?

A. That's correct.

At the June 12, 2002 trial, Mother testified that, although she lived with Father during 1998 and 1999, she moved out of his home in January 2000. Mother further testified that, on school mornings, Mother would take Child to Father's residence so that Child could ride with Father's godson (the Friends' Son) to school. In Mother's words,

that was comforting to [Child] too [sic], you know, ride on the bus with [the Friends' Son] because he knows the ropes, you know, he knows the people. And, you know, she ride [sic] the bus back and forth to school with him.

And then, you know, I would just leave, you know. Or I would, you know, stay for a little bit or whatever and then I'd just leave. But I never lived there.

And then also on April 5th when we came to court, it was like so upsetting and I couldn't take it, the way he was acting and stuff like that so I just transferred her to ... school. Because, you know, from my heart, I was just doing him a favor to where he could see his daughter which on his hectic schedule is—he told you before. It's like he hardly gets to see her cause [sic] he's always on call. He's always working. He's working on his house. He's building this big house; it's not finished, you know, so he's always busy.

At the June 12, 2002 trial, Mr. D testified that Child lived with Father until April 5, 2002. When asked by counsel for CSEA, "And [Child] never lived away from [Father's] house either during this period?", Mr. D replied "No."

In a May 8, 2002 Status Report/Recommendation filed on June 10, 2002, the social worker describes an April 23, 2002 telephone conversation with Mrs. D. While conducting an interview of Father, the social worker spoke with Mrs. D on the telephone because Father had stated that Mrs. D would corroborate Father's statement that Child had been living in his home. The social worker reports that:

[Mrs. D] stated that [Child] "sorta" lived in two places. Mother would bring her to the house in the mornings and she would catch the bus with [the Friends' Son]. The two children would be together. Mother would be there when [Child] came home after school. Sometimes [M]other and [C]hild ate dinner at the home, sometimes [M]other and [C]hild slept over or [Mother] would bring [Child] in the mornings.

Approximately seven minutes after Father left the interview, Mrs. D called the social worker back and told the social worker that she had thought about their conversation, discussed it with Mr. D, and felt uncomfortable with the statements she had made earlier. Mrs. D then stated that Mother and Child had lived with Father until the date of the April 5, 2002 hearing. When asked, Mrs. D denied that Father had contacted her after leaving his interview with the social worker. However, at a later interview, Father admitted that he did call Mrs. D after speaking with the social worker. He asserted that he was upset that she did not tell the truth and could not understand it. He also stated that he did not know why Mrs. D told the social worker that Father had not called her. At trial, during examination by the court, Mr. D explained that Mrs. D had been sick on the day that the social worker called, and only realized that she had made a mistake after the conversation ended.

It is clear that (1) Mother became unemployed at the end of November 2000 and was still unemployed at the time of the trial, (2)

Mother commenced receiving public assistance money for Child in November 2001, and (3) Father's financial support for Child prior to the Relevant Eight Months is not relevant because CSEA is not asserting claims for child support paid by DHS prior to the Relevant Eight Months.

Although there is conflicting evidence regarding where Child lived during the Relevant Eight Months, there is evidence to support a finding that, (1) during that time, Child was living with Mother, (2) Mother brought Child to Father's home each morning so that Child could ride the bus to school with the Friends' Son, (3) Mother would be there when Child came home after school, and (4) at times Child visited Father at Father's house, sometimes sleeping over.[7]

### C.

■ Father argues that the family court was clearly erroneous in finding that "Father's testimony as [to] when [Child] lived with him was disingenuous at best" in FOF no. 33. The word "disingenuous" means "[n]ot straightforward" and "crafty." THE AMERICAN HERITAGE DICTIONARY 378 (1969). In so describing Father's testimony, the court decided that Father's testimony lacked credibility. "It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." *State v. Jenkins*, 93 Hawai'i 87, 101, 997 P.2d 13, 27 (2000) (cita-

tions and brackets omitted). Therefore, we will not disturb FOF no. 33.

### D.

■ Mother testified that, for a time after she became unemployed in November 2000, she received unemployment benefits. According to Mother, after these benefits ran out, her caseworker explained to her that:

> I would have to go on food benefits cause [sic] I wasn't on food benefits, just on the Quest for medical, and food stamps, you know, to help me. And she explained to me I would have to go on full coverage for Welfare and that from there to go for child support.

When questioned about Father's support of Child, Mother provided the following testimony:

> Q. Has [Father] ever given you money for the benefit of [Child]?
>
> . . . .
>
> A. Oh, like if she needed medicine or paying for, you know, the doctor's visit when I take her to the doctor or she needs new shoes, yeah.
>
> Q. Okay. So after you were laid off, he continued to provide some of those things for her?
>
> A. Yeah, just like the normal like before or whatever if she needs something like shoes or clothes, you know, to help.

At the time of trial on June 12, 2002, Child was covered by Father's medical insurance plan and was the primary beneficiary of Father's life insurance policy.[8]

---

7. In her May 8, 2002 Status Report/Recommendation, the social worker stated that Mrs. D told her that Mother and Child slept over at Father's home "sometimes." Similarly, at the June 12, 2002 trial, Mother testified, in relevant part, as follows:

> Q. So this is [Child] staying over night with [Father] after you've moved out?
> A. Um, yeah.
> Q. Okay. And how often would that happen?
> A. Not—not that often.
> Q. Once a week, once a month, once a year, two days a week, five days a week?
> A. No, just at all times and stuff like that. You know, when he's off, then he'll take her. Cause [sic] he's always busy working. Either he's working on the house or he's working at

work, getting called in for emergency or he's just too tired.

8. At trial, Father testified in relevant part as follows:

> Q. I'm showing you what is marked as Father's Exhibit 8. What is that?
> A. That is a dependent beneficiary information for my job for insurance purposes showing [Child] as my beneficiary 90 percent. And I had [Mother] at 10 percent.
> . . . .
> Q. . . . When did you first put [Child] on your life insurance as a beneficiary?
> A. After her birth. I mean, that's the only child that I have.
> Q. Okay. And she continues to be a beneficiary?
> A. She continues to be a beneficiary and so does [Mother].

FOF no. 30 states that "Father did not provide any regular financial support for [Child] from the period November 2001 to [June 2002], but did provide some financial support in the prior period." Because the phrase "regular financial support for [Child]" is not defined, the finding that "Father did not provide any regular financial support for [Child] from the period November 2001 to [June 2002]" does not answer the question whether during that Relevant Eight Months, while Child lived with Mother and visited Father, (a) Father paid for any of Child's expenses, and (b) which payment(s) should be credited against Father's child support obligation to DHS. On remand, this question should be answered.

### E.

■ When read together, do the relevant statutes create an HRS § 346–37.1 "debt due and owing to [DHS] by the natural or adoptive parent or parents who are responsible for support of such children" in the amount calculated in accordance with the applicable child support guidelines? Notwithstanding HRS § 346–37.1(b) and HRS § 584–15(e), the answer is no.

■ Generally, when parent A seeks past due child support from parent B, the amount is calculated in accordance with the applicable child support guidelines without regard to the actual expenditures made by parent A on behalf of the child during that past period of time. In this case, however, CSEA is seeking, as stated in HRS § 584–15(c), "the noncustodial parent to reimburse" DHS for, (a) as stated in HRS § 346–37.1, the "payment of public assistance money made to or for the benefit of" Child and, (b) as stated in HRS § 584–15(c), the "reasonable expenses incurred prior to entry of judgment, including support, maintenance ... expended for the benefit of the child." It follows that, in paternity proceedings, the CSEA may not obtain a judgment for an amount of money unless and until it proves payment by DHS of at least that amount to or for the benefit of the child. That is the reason why HRS § 346–37.3 requires that "[DHS] shall notify the [CSEA] of the amount of, and the periods during which, public assistance was provided

to or for the benefit of any dependent child or children."

■ In summary, the CSEA may obtain a judgment in the amount of "any payment of public assistance money made to or for the benefit of" the child, and the amount of the "reasonable expenses incurred prior to entry of judgment, including support, maintenance ... expended for the benefit of the child." However, the total amount of that judgment shall not exceed the amount payable by the Respondent for the relevant period of time pursuant to "the child support guidelines established pursuant to section 576D–7[.]"

In this case, there is no evidence of the amount of "public assistance money" paid by DHS "to or for the benefit of" Child for the Relevant Eight Months or the amount of the "reasonable expenses incurred prior to entry of judgment, including support, maintenance ... expended for the benefit of" Child by DHS for the Relevant Eight Months. On remand, the CSEA shall be allowed the opportunity to satisfy its burden of proof with such evidence.

### 2.

■ Father contends that FsOF nos. 18 and 22 are clearly erroneous. Father testified in relevant part as follows:

[COUNSEL FOR CSEA]: You collect rent from [the Friends]?

[FATHER]: It's basically ohana, you know. They take care of some of the utilities, and his wife cooks. We [are] just kind of working out things for each other, you know.

[COUNSEL FOR CSEA]: Okay. But they don't give you rent on a regular basis every month as normal renters would give a landlord?

[FATHER]: Right. These are good friends of mine.

Mr. D testified in relevant part as follows:

[COUNSEL FOR CSEA]: Do you pay [Father] rent?

[Mr. D]: Well, we have an agreement because—

[COUNSEL FOR CSEA]: What is your agreement in detail, please.

[Mr. D]: We pay—he pays utilities one month; I pay utilities one month. And we sort of switch off on his mortgage.

[COUNSEL FOR CSEA]: Okay. What is the amount—you switch off like if you're paying utilities one month, the next month you pay mortgage, utilities; mortgage, utilities. That kind of thing?

[Mr. D]: Something like that.

In this situation, the "utilities" are water and electricity. Mr. D testified that when Mother was a resident, the water bill was "about 90–something every two months" and the electric bill was "about 190, 200 every month." After Mother moved out, the water bill dropped to "about 60–something" and the electric bill dropped to "about 180, 170." Mr. D testified that when it is his turn to pay the mortgage, he gives Father "1,250 a month[.]" Mr. D explained why he and Father came to this arrangement:

[Mr. D]: ... See, our agreement was I was hurting on cash. And I was really struggling because I was trying to save money to put my oldest boy into college. And—and [Father] and I was talking, and he was going to rent the upstairs. So him [sic] and I, being as tight as we are, we're like brothers, we just sat down and we came up with this idea, Why [sic] don't we—

Cause [sic] we was [sic] paying like—I was paying like 1,600 a month for rent where I was staying. So we just came up with the agreement, Hey [sic], I need some cash. You need to save some money. Why don't you move in with me. So me and my wife and my family, we talked about, and we thought it was a good idea so that's what we did.

In other words, Father admits to his arrangement with the Friends and his receipt of "additional income" from them. He challenges the findings (1) that he "denied any additional income", and (2) that his testimony

that the additional income is "not in the nature of rent is not credible." In essence, he denies that the "additional income" is "rent".[9] As stated in his opening brief, "[Mr. D] later testified that they would alternate months on payment of utilities and the mortgage amount. But [Mr. D's] testimony was consistent with Father's that they did not pay a set, monthly rent."

■ Rent is the "[c]onsideration paid for use or occupation of property. In a broader sense, it is the compensation or fee paid, usually periodically, for the use of any rental property, land, buildings, etc." BLACK'S LAW DICTIONARY 1297 (6th ed.1990). Although Father has decided not to label the Friends's payment of utility bills or his mortgage as "rent", it is clear that he regularly enjoys a monetary benefit from allowing the Friends to occupy his property. In the absence of this arrangement, Father would have to make these payments himself. There is little difference between this arrangement and an arrangement where Mr. D and/or Mrs. D wrote Father a check each month, the proceeds from which Father then used to make these payments. However, whether "rent" or not, this "additional income" was properly included in the computation of Father's monthly income for child support purposes. In this case, the question whether the "additional income" comes in the form of "rent" is inconsequential.

## CONCLUSION

Accordingly, we vacate the June 26, 2002 Judgment of Paternity and remand for further proceedings consistent with this opinion.

---

9. Father's tax return for 2001 is not in evidence and Father was not asked (1) if his mortgage payments included payments for his real property taxes, (2) how much, if any, of Mr. D's mortgage and utility payments he listed as income to him, (3) and how much of a deduction, if any, he claimed for payment of (a) interest on his residential mortgage and (b) real property taxes on his residence.