*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

**Electronically Filed**
**Supreme Court**
**SCAP-16-0000837**
**04-OCT-2018**
**08:30 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

LC,
Petitioner-Appellant,

vs.

MG and CHILD SUPPORT ENFORCEMENT AGENCY, STATE OF HAWAI'I,
Respondents-Appellees.

SCAP-16-0000837

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(CAAP-16-0000837; FC-P NO. 16-1-6009)

OCTOBER 4, 2018

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.[1]

OPINION OF THE COURT EXCEPT AS TO PART III(B) AND
OPINION AS TO PART III(B) BY NAKAYAMA, J., IN WHICH
RECKTENWALD, C.J., JOINS

The Uniform Parentage Act (UPA) was adopted by the

Hawai'i State Legislature in 1975 to "provide substantive legal

_____

[1]     Justice Nakayama, with whom Chief Justice Recktenwald joins, writes the opinion of the court except as to Part III(B).  Justice McKenna, with whom Justice Pollack and Justice Wilson join, joins the opinion of the court except as to Part III(B), and writes the opinion of the court with respect to the issue addressed in Part III(B) of Justice Nakayama's opinion.

equality for all children regardless of the marital status of their parents." H. Stand. Comm. Rep. No. 190, in 1975 House Journal, at 1019. To that end, the UPA presumes legal paternity in certain circumstances. One such presumption of paternity is the marital presumption, which presumes that a man is the natural father of a child when he and the child's mother are married to each other and the child is born during the marriage. The issue in this case is whether this presumption similarly applies in determining whether a woman married to the child's natural mother is the parent of that child.

Petitioner-Appellant LC sought a divorce from her wife Respondent-Appellee MG in the Family Court of the First Circuit (family court) shortly after a child was born to MG through an artificial insemination procedure. While LC and MG were legally married at the time of the child's birth, LC is not biologically related to the child. After the child was born, LC subsequently sought an order in the family court to disestablish paternity. The family court denied LC's request, determining that under the UPA and Hawaii's Marriage Equality Act (MEA), LC was the child's legal parent. LC appealed, and the case was transferred to this court from the Intermediate Court of Appeals.

For the reasons discussed below, we first hold that both the UPA and the MEA demonstrate that the UPA's marital

presumption of paternity applies equally to both men and women. Therefore, because LC and MG were legally married at the time that the child was born, LC is presumed to be the legal mother of the child. Second, we hold that LC did not rebut the presumption of parentage.

Accordingly, we conclude that LC is the legal parent of the child, and affirm the family court's November 1, 2016 Decision and Order denying her request to disestablish paternity.

## I. BACKGROUND

LC and MG first met in 2010, and began a relationship in 2011. At that time, LC was a student at the Naval Academy in Annapolis, Maryland and MG lived in Silver Spring, Maryland. Also during that time, LC and MG began to discuss the possibility of having a child together. On October, 13, 2013, LC and MG were legally married in Washington, D.C. The day after, both parties visited Shady Grove Fertility Reproductive Science Center (Shady Grove) in Rockville, Maryland. There, they both signed Shady Grove's "Ovulation Induction, Monitoring and/or Insemination Treatment" form and a "Consent to Accept Donated Sperm from Anonymous Donor." The consent form read in part,

> I/We, [MG] ("Sperm Recipient") and [LC] ("Recipient Partner", if applicable) each hereby jointly and individually elect to utilize donor sperm of an anonymous donor recruited by a Sperm Bank ("Donor") which may be used as part of my/our assisted reproductive technology treatments. . . .

. . . .

> I have read the "Information Packet for Use of Donor Sperm" as well as this Consent document in its entirety and have had ample time to reach my/our decision free from pressure and coercion, and agree to proceed with my/our participation in the use of donor sperm as stated above.

The parties decided that MG should carry their first child, because she was older and LC was currently serving in the military.

The parties relocated to Oʻahu, Hawaiʻi pursuant to LC's military orders and assignment in October 2014. At that time, MG was not employed, and LC financially supported the couple.

In December 2014, LC and MG jointly attended an appointment at the Fertility Institute of Hawaiʻi (FIH), met with a physician's assistant, and toured the facility.

In January 2015, LC deployed overseas and MG remained on Oʻahu. While LC was deployed, she continued to communicate with MG regarding MG's plans to become pregnant. On February 23, 2015, MG sent a text message to LC:

> I do have to tell you something... I'm so worried about IUI [intrauterine insemination]... I have been checking the PO box every single day waiting for my refund and nothing! My menses is here and I'm supposed to order out [sic] vial on Monday morning. I'm so upset and depressed bc I don't have the extra money right now...

The next day, MG texted LC that " it looks like everything is all good. I start clomid[2] tonight and come back in a week. And I'm so happy that I do have 'time' to order our vial!" LC

---

[2]      Clomid is a fertility drug.

responded, "I'm glad everything went ok."

On February 25, 2015, LC (still overseas) and MG discussed their relationship through text messages. When MG asked whether LC was having second thoughts about having a child, LC responded that she "want[ed] to make sure we are truly good before we start a family," and "want[ed] a child more than anything but [wanted] them to have parents that adore each other as well as them." MG asked LC whether she was "backing out." LC responded, "What are you talking about backing out? I have always wanted a child[.]" LC stated that she was "concerned about us. I want a loving family that respects each other[.]" The text message exchange ended when MG responded:

> [MG:] The way (from our previous convos), I'd stres [sic] taking the pills for he [sic] past few days per doctor's orders
> [MG:] I have been taking the pills since Monday to prepare[.]
> [MG:] I forgot to tell you that.
> [MG:] Night!

The next day, LC responded, "K @ pills."

On March 2, 2015, a cryobank sent a sperm sample to FIH and billed it to MG. After an ultrasound appointment, MG texted LC about the results of the ultrasound, and stated that FIH would "call [her] later [that day] to let [her] know if we can get IUI tomorrow or Wednesday." After several other texts were sent by MG, LC responded, "Hi honey. Ok. [Talk to you] after my flight. I love you[.]"

5

On March 4, 2015, MG signed FIH's "Consent for Intrauterine Insemination." Because LC was overseas, she did not sign the consent form. The IUI procedure also took place on March 4, 2015.

On March 19, 2015, MG informed LC via text message that she was pregnant. Five hours later, LC responded, "I'sa pregnant!! I love you baby!!! [. . .] [Good morning] honey that's great news to awaken to! [. . .] I get to rub your tummy and feel our baby[.]" When MG asked LC when they should tell people about the pregnancy, LC responded, "You tell me when. I'm telling my mom and brother whenever we do[.]"

Around Mother's Day 2015, while LC was still deployed, she wrote a "Future Mother's Day Card" to MG. Enclosed in the card was a note to "The Future Mother" from "The Future Momma/Papa." The note also contained a poem which referenced MG's pregnancy and stated that "[y]ou will cry, you will smile, you will look into our child[']s eyes, and we will love you through it all." (Emphasis in original.) The note was signed by LC and after the signature, LC further wrote "I will always be here for our family!" Similarly, on June 8, 2015, LC addressed a postcard to "[MG] & Future Son/Daughter," which stated that LC had gotten MG "a spa kit to let [her] pamper [herself] and for my future child I bought you the softest/coolest Iceland bear I

could find.  I love you both!  Hope you enjoy your gifts!"
(Formatting altered.)

When LC returned to Hawaiʻi in September 2015, she attended both an ultrasound appointment and a lamaze class with MG.

On October 7, 2015, LC filed a motion for divorce from MG in the family court.  On November 11, 2015, MG gave birth to the child at Castle Medical Center on Oʻahu.  The child's birth certificate lists MG as the "mother" and LC as the "co-parent".  At the time that the child was born, LC and MG were not legally divorced; divorce proceedings were pending.

## A.  Family Court Trial

On January 11, 2016, LC sought an order in the family court to disestablish parentage.[3]  LC also submitted a declaration with her petition that stated that she "did not sign any documents stating that she consented to the alleged in vitro fertilization that lead [sic] to the pregnancy," that the child born to MG was not hers, "genetically or otherwise," and that she "never held [the] child out to be her own."  (Emphasis in original).

At trial, MG first called two witnesses to testify as to LC's involvement in MG's medical appointments on Oʻahu.

---

[3]    The Honorable Matthew J. Viola presided.

7

First, Robin Washowsky (Washowsky), the business manager of FIH, testified about MG's medical records and LC's consent to MG's IUI procedure. On cross-examination, after being asked to confirm that there is a line for a partner's initials on the "Consent to Receive Cryopreserved Sperm" form, Washowsky was asked how the absence of a spouse's signature on a consent form would affect the patient's procedure.[4] Washowsky responded that "[i]f there's a spouse here, we can have them sign. But in the absence of a spouse, we would still go through with the procedure." Washowsky further testified that there were no signatures or initials from LC anywhere in MG's FIH medical file. Nevertheless, Washowsky testified on redirect examination that if FIH received a withdrawal of consent to an artificial insemination procedure, the clinic would have a duty to inform the patient of that withdrawal. Washowsky further stated that there was no evidence in MG's medical record that MG was notified of any withdrawal of consent.

Dr. Emilie Stickley (Dr. Stickley), an OB/GYN at Pali Women's Health Center (PWHC), also testified. Dr. Stickley testified that LC attended a July 2015 medical appointment via video conference with MG and herself. Regarding the topics

_____

[4] As noted, LC did not sign the "Consent for Intrauterine Insemination" that MG signed on March 4, 2015 before MG received the sperm at FIH.

8

discussed during the appointment, Dr. Stickley stated that neither LC nor MG expressed to her that they no longer wanted to go through with the pregnancy.  After the July 2015 appointment, Dr. Stickley did not recall any further contact with LC.

MG also testified.  On direct examination, when asked whether she received any documents from FIH before the birth of the child indicating that LC was trying to withdraw consent, MG responded "no."  However, when asked on cross-examination whether she emailed LC copies of the consent to receive sperm that she herself initialed and signed, MG also testified that she did not.

On the second day of trial, LC testified.  LC first testified that she had no involvement in using FIH or choosing a sperm donor.  While LC admitted that she and MG discussed the possibility that MG become pregnant by assisted reproduction, LC also testified that she told MG "several times" beginning in March 2014 that she did not want to go forward with assisted reproduction.  LC specifically testified:

> And before we left -- before I left in January [2015], for our anniversary we had this big argument where [MG] said that we should not have children, and I agreed.  And then she brought it back up while I was on deployment, and I specifically called her and told her this was not the right time as well as -- she hung up, and that's how the whole text message chain started, where again [. . .] I stated that this was not the right time for us to -- to have a child.

LC also believed that her text to MG, which read, "I want to make sure that we are truly good before we start a family" and the

following exchange, "specifically" demonstrated that LC did not want to go forward with the pregnancy.

LC also explained that when she received MG's texts about taking Clomid pills, she knew that because she was eight thousand miles away, there "was nothing [she could] do" to stop MG from taking them. Therefore, LC testified that she just responded "K at pills." LC also stated that it was her understanding that MG was taking the pills "to get ready for the process." LC later testified that when MG sent the text telling her that she was taking Clomid pills, she "called [MG] immediately and told her to –- to pause." LC stated that this was the second time she told MG to stop taking Clomid.

Similarly, regarding MG's "I'm pregnant" text and LC's response, LC testified that she felt there was nothing she could do to stop MG's pregnancy:

> [LC'S COUNSEL:] What did you mean by "our baby"? What's going through your mind when that's happening?
>
> [. . . .]
>
> [LC:] Oh I believe it was in –- so March. So again, after [MG] had already done the IUI and it's confirmed that she is pregnant –- I mean, like, at this point there's absolutely nothing that I knew at that time that I can do. [. . .] So I mean, I'm stuck, and she's my wife. So I –- I guess it's "our baby."
> [LC'S COUNSEL:] I see.
> So did you ever tell your mom and brother that –- that you were having a baby with –- with [MG] or that [MG's] having a baby for you?
> [LC:] I –- I told my mother and brother that despite my wishes, [MG] is pregnant.

With respect to the postcard to "[MG] & Future Son/Daughter," LC first denied that she had ever sent the postcard. Instead, LC testified that the postcard, along with the spa kit, was actually in a box of belongings that remained in LC's possession until she returned from deployment. LC testified that she only gave MG these items when she returned home. Specifically, LC stated:

> [LC:] So this is -- again, this was part of my journal, and there were more entries in my journal of me just expressing everything. [. . .] I've always wanted a child, and I always thought it would be with [MG]. So I'm just expressing everything that I want to do, that I want to actually be able to do. Like -- like, she's pregnant, and if it were mine, like, I would be doing all these things. [. . .]
> So I'm just, in this point, trying to figure out -- like, hey, this is what I want and, like, you are going to be so loved, and I'm going to get you the best thing from all the places of the world that I will ever possibly go. [. . .] So I grabbed -- so bears. I grabbed toiletries. I grabbed as much stuff as I could from this place as well as other places in the world that I went.
> THE COURT: Can I interrupt for a second. I just want to clarify something. [. . .] [Y]our testimony is that you were referring to not the child that [MG] was pregnant with, but possibly a future child you'd have with [MG]?
> [LC:] Yes.
> THE COURT: At that point, if I understood your testimony correctly -- your testimony was that you had told [MG], "Don't go through with this procedure till I'm back."
> [LC:] Yes.
> THE COURT: And she -- your testimony is that she ignored your -- your statements and went ahead and got pregnant anyway. [. . .]
> [LC]: Yes.
>
> [. . . .]
>
> THE COURT: So can you -- can you explain to me why you're still considering having a child with [MG] in the future?
> [LC:] Again, like, this is -- this is my wife, and I was trying to reconcile, like things with her. [. . .] And at this point in time, I'm like, okay, like, yeah, she's done all this bad stuff, but [. . .] maybe there's a chance

11

> that we can fix this and everything will be all right, even despite all of this. But more things happened after this date that was just -- like, "You care nothing about me, and it's only about you." So yeah, this -- this isn't going to work.

Regarding the ultrasound appointment and the lamaze class that she attended with MG after she returned from deployment, LC testified that because MG did not have a car, she needed to take her. Specifically, because MG requested a ride to her lamaze class, LC testified that she drove her to the class and accompanied her inside.

Finally, LC attempted to enter into evidence two faxes she sent to Shady Grove and FIH withdrawing consent to an IUI.[5] The fax to Shady Grove is dated January 1, 2014 and LC testified that it was written and sent to the facility a couple of weeks after LC and MG returned from their honeymoon that same month. According to the date stamp on the fax, Shady Grove received the fax on December 9, 2015 (after the child was born).

**B.  The Family Court Decision and Order**

On November 1, 2016, the family court entered a decision and order concluding that a legal parent/child relationship existed between LC and the child. The family court therefore denied LC's request for an order that she be

---

[5]    The family court did not admit the withdrawal fax to FIH into evidence for lack of foundation. The family court admitted the withdrawal fax to Shady Grove (Exhibit KK) into evidence by stipulation.

12

disestablished as legal parent of the child.

In its order, the family court began by describing what it believed to be the fundamental issue in this case: "Does a legal parent/child relationship exist between Petitioner and the Child?" In order to answer that question, the family court looked to the UPA, which lists several circumstances in which a man would presumptively be the "natural father" of a child. Hawaiʻi Revised Statutes (HRS) § 584-4(a) (2006).[6] Furthermore,

---

[6] HRS § 584-4(a) (2006) provides in relevant part:

**Presumption of paternity.** (a) A man is presumed to be the natural father of a child if:
(1) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within three hundred days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a decree of separation is entered by a court;
(2) Before the child's birth, he and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with the law, although the attempted marriage is or could be declared invalid . . . ;
(3) After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with the law, although the attempted marriage is or could be declared invalid . . . ;
(4) While the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child;
(5) Pursuant to section 584-11, he submits to court ordered genetic testing and the results, as stated in a report prepared by the testing laboratory, do not exclude the possibility of his paternity of the child . . . ;
(6) A voluntary, written acknowledgment of paternity of the child signed by him under oath is filed with the department of health[.]

13

the family court noted that HRS § 584-21 (2006) provides that in actions to declare a mother and child relationship, "[i]nsofar as practicable, the provisions of [the UPA] applicable to the father and child relationship," i.e. provisions like HRS § 584-4(a), "shall apply."

The family court also noted that Hawaii's MEA intended that "there be no legal distinction between same-sex married couples and opposite-sex married couples with respect to marriage[.]"[7]

Applying these statutory provisions to this case, the family court first determined that HRS § 584-4(a)(1) presumes that a man is the natural father of a child if "he and the child's natural mother are or have been married to each other and the child is born during the marriage."  Applying that provision in a gender-neutral fashion as required by HRS § 584-21, the family court determined that because LC and MG, the child's

---

[7]     HRS § 572-1.8 (Supp. 2014) provides:

> **Interpretation of terminology to be gender-neutral.**  When necessary to implement the rights, benefits, protections, and responsibilities of spouses under the laws of this State, all gender-specific terminology, such as "husband", "wife", "widow", "widower", or similar terms, shall be construed in a gender-neutral manner.  This interpretation shall apply to all sources of law, including statutes, administrative rules, court decisions, common law, or any other source of law.

However, the family court's decision does not actually rely on the MEA to conclude that the marital presumption of parentage applied to LC.

14

natural mother, were married to each other at the time the child was born, LC is presumed to be the child's legal parent.[8]

The family court then explained that under HRS § 584-4(b) (2006), the presumption of parentage was rebuttable:

> A presumption under this section may be rebutted in an appropriate action only by clear and convincing evidence. If two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls[.]

The family court noted that "[i]n the context of a child conceived through artificial insemination by donor during a marriage, the presumption of legal parentage incorporates a rebuttable presumption of consent to the artificial insemination. Only clear and convincing evidence can rebut the presumption of consent and therefore legal parentage."  For support, the family court noted that several other jurisdictions imposed a presumption of consent to artificial insemination by the spouse of a woman who gives birth to a child by that procedure.

Therefore, in order for LC to rebut the presumption that she was the legal parent of the child in this case, the family court explained that LC would need to prove, by clear and convincing evidence, that she did not consent to MG undergoing the IUI procedure that resulted in her pregnancy and the birth of

---

[8]    However, the family court also concluded that HRS § 584-4(a)(4) "d[id] not create a presumption of a parent-child relationship between [LC] and [MG], because [LC] did [not] receive the Child into her home and hold out the Child as her natural child."

15

the child.

The family court then made several credibility determinations regarding LC's actions and testimony.  It found that:

68.    MG's Exhibit KK is a letter dated January 1, 2014 from [LC] to Shady Grove.  The letter states that [LC] withdraws her consent to IUI, IVF or any other procedure performed on MG and that any child born to [MG] without [LC's] consent "will not be my child or responsibility in any way."

69.    There is no credible evidence that [LC] sent the letter marked as Ex. KK to Shady Grove prior to the birth of the Child.

70.    There is no credible evidence that [LC] gave a copy of the letter marked as Ex. KK to [MG] or informed her of its contents prior to the birth of the Child.

71.    [MG] did not become aware of the letter marked as Ex. KK or its content until after the birth of the Child.

. . . .

74.    There is no credible evidence that prior to [MG] undergoing the IUI procedure on March 4, 2015 or prior to the Child's birth that [LC] informed FIH that she did not consent to or that she objected to [MG] undergoing an IUI or any other artificial insemination procedure to become pregnant.

75.    Prior to March 4, 2015, [LC] did not inform [MG] that she objected to and/or did not consent to [MG] undergoing an IUI or any other artificial insemination procedure at FIH.

76.    [LC's] testimony that prior to [MG] undergoing the IUI artificial insemination procedure on March 4, 2015 she clearly verbally informed [MG] that she objected to [MG's] attempt to get pregnant at that time was not credible.

77.    On November 11, 2015, [MG] gave birth to the Child at Castle Medical Center.

78.    [MG] is the Child's natural mother.

79.    Both [LC] and [MG] are listed as the Child's parents on his birth certificate.  [LC] did not consent to her

16

being listed as a parent on the birth certificate.

Accordingly, the family court determined:

> 108.  [LC] did not meet her burden of proving by clear and convincing evidence that she did not consent to [MG] undergoing the artificial insemination procedure that resulted in her pregnancy and the birth of the Child. [LC] therefore has failed to rebut the presumption under HRS § 584-4(a)(1) that she is a legal parent of the Child.
>
> 109.  Accordingly, the court finds and concludes that a legal parent/child relationship exists between [LC] and the Child, i.e., that [LC] is a legal parent of the Child, and therefore [LC's] request for an order that she be disestablished as a legal parent of the Child is denied.[9]

## C.  Appellate Proceedings

LC filed a notice of appeal on November 28, 2016.[10] In her opening brief, LC raised two points of error, which we construe to present three arguments.  First, LC argued that the family court erred when it decided that LC was the legal parent of the child even when she had no genetic link with the child.  Second, LC argued that the family court erred when it decided that the marital presumption of parentage, HRS § 584-4(a)(1), applied to LC.  And third, LC contended that even if the marital presumption applied, the family court erred when it decided that

---

[9]  The family court subsequently made related findings of fact and conclusions of law regarding custody, visitation, child support, and attorneys' fees and costs.

[10]  Respondent-Appellee Child Support Enforcement Agency (CSEA) was made a "nominal appellee" in this case.  See Hawaiʻi Rules of Appellate Procedure (HRAP) 2.1(b).  As a nominal appellee, the CSEA "assert[ed] no interest in the outcome of the appeal."

17

she did not rebut the presumption.

MG filed an answering brief requesting that this court affirm the family court's determination that LC is the legal parent of the child. MG contended that the UPA's "marital presumption of parentage applies to anyone –- whether male or female –- who is married to a woman who gives birth," and that LC "failed to produce clear and convincing evidence that she did not consent to the conception of the child."

The State of Hawaiʻi filed an amicus brief which adopted MG's position with respect to the marital presumption of parentage, i.e., that "the spouse of a woman who delivers a child must be deemed the presumptive legal parent of the child pursuant to HRS § 584-4(a)(1) (the "marital presumption"), regardless of any genetic link to the child."[11]

On August 9, 2017 LC filed an application for transfer to this court, which was granted.

## II. STANDARDS OF REVIEW

### A. Statutory Interpretation

"The interpretation of a statute is a question of law reviewable de novo." In re Doe, 95 Hawaiʻi 183, 190, 20 P.3d 616, 623 (2001) (citations and ellipses omitted). This court's

---

[11] The State did not take any position on whether LC failed to show by clear and convincing evidence that she did not consent to MG's pregnancy.

statutory construction is guided by established rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

Id. at 191, 20 P.3d at 624 (quoting Gray v. Admin. Dir. of the Court, 84 Hawaiʻi 138, 144, 931 P.2d 580, 586 (1997)).

> It is a cardinal rule of statutory construction that courts are bound, if rational and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all the words of the statute.

County of Kauaʻi v. Hanalei River Holdings, Ltd., 139 Hawaiʻi 511, 526, 394 P.3d 741, 756 (2017) (quoting Camara v. Agsalud, 67 Haw. 212, 215-16, 685 P.2d 794, 797 (1984)).

**B.    Family Court Decisions**

Generally, the "family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion." In re Doe, 95 Hawaiʻi at 189, 20 P.3d at 622 (citing In Interest of Doe, 84 Hawaiʻi 41, 46, 928 P.2d 883, 888 (1996)). "Under the abuse of discretion standard of review, the family court's decision will not be disturbed unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant[, and its] decision clearly exceed[ed] the bounds

19

of reason."  In Interest of Doe, 84 Hawai'i at 46, 928 P.2d at 888 (alterations in original).

## C.    Findings of Fact and Conclusions of Law

The family court's findings of fact are reviewed on appeal under the "clearly erroneous" standard.  Fisher v. Fisher, 111 Hawai'i 41, 46, 137 P.3d 355, 360 (2006).

> A [finding of fact] is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.  "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

Id.

"The family court's [conclusions of law] are reviewed on appeal de novo, under the right/wrong standard."  Id. (citing In re Doe, 95 Hawai'i at 190, 20 P.3d at 623).  Conclusions of law are "not binding upon an appellate court and are freely reviewable for their correctness."  Id. (citing In re Doe, 95 Hawai'i at 190, 20 P.3d at 623).

## D.    Credibility of Witnesses

"[I]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact."  In re Doe, 95 Hawai'i at 190, 20 P.3d at 623 (quoting State v. Jenkins, 93 Hawai'i 87, 101, 997 P.2d 13, 27 (2000)).

20

## III.  DISCUSSION

On appeal, LC alleges that the family court erred in 1) denying LC's petition to disestablish parentage because the UPA "requires there to be a genetic link" between LC and the child; 2) deciding that a legal parent-child relationship existed between LC and the child, because the statutory marriage presumption does not apply; and 3) even if the marriage presumption applies, deciding that LC did not rebut the presumption.

LC states in her opening brief that "all this case really comes down to is whether [LC] may be deemed to be the Child's legal parent simply because these two women were married when the Child was conceived through [IUI] and born."  The answer to this question is, however, only half of the analysis.  If the marital presumption of paternity applies to LC, then we must also determine whether LC rebutted that presumption.  Both questions present issues of first impression for this court.

For the reasons stated below, we hold that the UPA's marital presumption of paternity equally applies to women in same-sex marriages.  Because it is undisputed that LC was married to MG at the time that the child was born, she is presumed to be the legal parent of the child.  We further conclude that LC did not rebut the presumption of parentage.

21

### A.   The marital presumption of paternity applies to LC.

LC argues that there are two reasons why the UPA's presumption of paternity cannot apply to her.  First, LC argues that the UPA requires a genetic link in order to establish a legal parent-child relationship, and therefore it is impossible for LC to be the "father" of the child.[12]  Second, LC contends that the MEA was not intended to broaden the scope of the UPA to apply it to spouses in same-sex marriages.

The language and purpose of the UPA and the MEA require us to reject these arguments.  First, the UPA does not require a genetic or biological connection to establish a legal parent-child relationship.  Second, the MEA requires that every gender-specific statutory provision of law regarding marriage be interpreted in a gender-neutral manner.

### 1.   The UPA does not require a biological connection to establish a legal parent-child relationship.

Both the language and the purpose of the UPA indicate that a genetic or biological connection is not required for a legal parent-child relationship to exist.  The UPA's statutory language indicates that legal parentage may arise even if there

---

[12]    LC appears to make this argument twice in her opening brief.  In her first point of error, LC argues that because the UPA requires a genetic link between someone like her and the child, the UPA cannot apply to her.  In her second point of error, LC argues that the UPA's presumption of paternity "[h]inges on 'Paternity' and Genetics."  We construe her assertions to raise the same argument.

22

is no biological connection to the child.  The UPA's presumption of paternity provision, HRS § 584-4(a), describes six different ways in which a person is presumed to be the legal parent of a child.[13]  But only one, HRS § 584-4(a)(5) (court-ordered genetic testing) is plainly based on biology.  The others, such as written acknowledgment of parentage, consent to be the parent on a child's birth certificate, and the presumption at issue here -- marriage to the child's natural mother -- are not.  Similarly, the UPA's list of evidence relating to paternity in HRS § 584-12 is not limited to evidence of a biological connection to the child.[14]  Evidence may also include "[a] voluntary, written

---

[13]    See supra note 6.

[14]    HRS § 584-12 (2006) provides a non-exhaustive list of evidence relating to paternity:

> **Evidence relating to paternity.**  Evidence relating to paternity may include:
> (1)    Evidence of sexual intercourse between the mother and the alleged father at any possible time of conception;
> (2)    An expert's opinion concerning the statistical probability of the alleged father's paternity based upon the duration of the mother's pregnancy;
> (3)    Genetic test results, including blood test results, weighted in accordance with evidence, if available, of the statistical probability of the alleged father's paternity;
> (4)    Medical or anthropological evidence relating to the alleged father's paternity of the child based on tests performed by experts.  If a man has been identified as a possible father of the child, the court may, and upon request of a party shall, require the child, the mother, and the man to submit to appropriate tests;
> (5)    A voluntary, written acknowledgment of
> (continued...)

23

acknowledgment of paternity" (HRS § 584-12(5)) or "all other evidence relevant to the issue of paternity" (HRS § 584-12(7)). This indicates that the legal parent determination does not turn on whether the person has any biological connection to the child.

Second, this court has previously cited the purpose of the UPA to hold that legal parentage does not require a biological connection to the child. In holding that a mother was estopped from filing a paternity action against the child's biological father after a divorce decree declared another man (her ex-husband) to be the legal father of the child, this court noted that even though the defendant was the biological father, the UPA did not require that a child's legal father be his or her biological one. Doe v. Doe, 99 Hawaiʻi 1, 7-8, 52 P.3d 255, 261-62 (2002). Instead, we said that the UPA was meant "to ensure that every child, to the extent possible, has an identifiable legal father. Although this goal will usually overlap with the desire of a child to know the identity of his or her biological

---

[14](...continued)

          paternity;
(6)    Bills for pregnancy and childbirth, including medical insurance premiums covering this period and genetic testing, without the need for foundation testimony or other proof of authenticity or accuracy, and these bills shall constitute prima facie evidence of amounts incurred for such services or for testing on behalf of the child; and
(7)    All other evidence relevant to the issue of paternity of the child.

father, the two are not always the same." Id. at 8, 52 P.3d at 262 (emphasis added).[15] Similarly, in Inoue v. Inoue, the ICA held that a mother was estopped from challenging the legal status of the child's presumptive father, even when it was established that he was not the "birth" father. 118 Hawai'i 86, 94, 185 P.3d 834, 843 (App. 2008), cert. denied, 118 Hawai'i 194, 186 P.3d 629 (2008).

Therefore, LC is simply incorrect when she contends that the UPA requires a biological connection in order for a person to be presumed the legal parent of a child. To the contrary, the statutory language and the purpose of the UPA indicate that presumptions of paternity are not restricted to persons that share a biological or genetic link with the child.

Finally, the UPA further suggests that, despite the gender-specific language in HRS § 584-4(a), the presumptions of paternity equally apply in determining the existence or nonexistence of a mother-child relationship. HRS § 584-21 states that in actions "to determine the existence or nonexistence of a mother and child relationship[, i]nsofar as practicable, the

---

[15] In arguing that the UPA requires some "genetics threshold" in order to determine the legal parent of a child, LC cites the dissent in Doe, which instead argued that the UPA's purpose was to ensure "that every child be assured of some legal relationship to his or her natural or biological father." 99 Hawai'i at 24, 52 P.3d at 278 (Acoba, J., dissenting) (emphasis in original).

provisions of [the UPA] applicable to the father and child relationship shall apply." We conclude that it would be practicable to apply the provisions of HRS 584-4(a) to the mother and child relationship because, as discussed above, a biological connection is not necessary to establish a presumption of parentage. Therefore, HRS § 584-21 itself suggests that the presumptions of paternity in HRS § 584-4(a) similarly apply when determining whether a woman is the legal parent of a child.

    2.    **The MEA intended to construe every gender-specific statutory provision of law regarding marriage in a gender-neutral manner.**

Even if the language of the UPA were not enough to convince us that the statutory presumptions of paternity apply to both men and women, the MEA leaves no doubt that the marital presumption must equally apply to women in same-sex marriages. The Legislature adopted the MEA in 2013 to "recognize marriages between individuals of the same sex in the State of Hawaiʻi." H. Stand. Comm. Rep. No. 4, in 2013 House Journal, at 189. In so doing, the Legislature wanted to ensure that any interpretation of marriage terminology be gender-neutral. The MEA specifically provides,

> **Interpretation of terminology to be gender-neutral**. When necessary to implement the rights, benefits, protections, and responsibilities of spouses under the laws of this State, <u>all</u> gender-specific terminology, such as "husband", "wife", "widow", "widower", or similar terms, shall be construed in a gender-neutral manner. This interpretation

26

> shall apply to all sources of law, including statutes, administrative rules, court decisions, common law, or any other source of law.

HRS § 572-1.8 (Supp. 2014) (emphases added).

The gender-neutral provision speaks for itself: all laws regarding the rights and responsibilities of spouses must be interpreted in a gender-neutral manner.[16] The marital presumption of parentage is a "source of law" regarding marriage, and therefore it must be construed in a gender-neutral manner pursuant to HRS § 572-1.8.[17] Once we apply the gender-neutral provision of the MEA to the UPA's marital presumption of paternity, HRS § 584-4(a) reads: "[a] [person] is presumed to be the natural [parent] of a child if: (1) [The person] and the child's natural mother are or have been married to each other and

---

[16] Furthermore, legislative history of the MEA reveals that the Legislature intended that "all rights, benefits, protections, and responsibilities of parentage derived from a marriage relationship under state law shall apply equally to all married persons regardless of gender[.]" See H. Stand. Comm. Rep. No. 4, in 2013 House Journal, at 189 (emphasis added).

It appears that this provision was not included in the final version of the statute (and only the more general "gender-neutral provision" of HRS § 572-1.8 remained) because the House Standing Committee believed that the "language relating to the gender-neutral application of marriage-derived parentage rights, benefits, protections, and responsibilities [was] superfluous." H. Stand. Comm. Rep. No. 4, in 2013 House Journal, at 192.

[17] This interpretation is in conformity with at least one other jurisdiction that has a similarly-worded marriage equality act. See Wendy G-M. v. Erin G-M., 985 N.Y.S.2d 845, 860 (N.Y. Sup. Ct. 2014) ("[T]he MEA mandates that [all laws] are gender neutral with respect to all the legal benefits, obligations, etc. arising from marriage. In [a previous case, the Appellate Division] predicated the husband's parental status on the fact of marriage, without regard to the husband's biological connection to the child or to his fertility in general. To impose the presumption of consent to [artificial insemination] for couples in a heterosexual marriage, but not for those in a same-sex one . . . would reverse the gender-neutral approach to New York's families canonized in the MEA.").

27

the child is born during the marriage, or within three hundred days after the marriage is terminated[.]"

In arguing that the marital presumption of paternity cannot apply to her, LC contends that applying the MEA's gender-neutral provision to the UPA would unfairly discriminate against women attempting to disprove legal parentage. This argument is unavailing. LC examines HRS § 584-12 ("evidence relating to paternity") and argues that if we replace every instance of the word "father" with "mother" in that provision, only three of the seven listed types of evidence could be used by a woman to rebut a presumption of parentage, while a man would still be entitled to use all seven. Because some avenues of relief in HRS § 584-12 are closed to a woman, LC argues that applying the MEA to the UPA would actually discriminate against a woman attempting to disprove parentage. But LC ignores the catch-all basis in HRS § 584-12(7), i.e. "[a]ll other evidence relevant to the issue of paternity of the child." This basis leads us to conclude that any difference in the number of methods available to women and men to prove parentage are irrelevant, because HRS § 584-12(7) explicitly permits the use of any relevant evidence to prove (or disprove) parentage.

To conclude, Hawaii's UPA does not require a biological or genetic link in order to establish a parent-child

28

relationship.  To require such a connection would be contrary to the language and the purpose of the UPA.  Additionally, the MEA's "gender-neutral interpretation" provision also requires, when necessary to implement a right or responsibility of a spouse, that <u>all</u> gender-specific terminology be construed in a gender-neutral manner.  <u>See</u> HRS § 572-1.8.  We therefore hold that the marital presumption of parentage applies equally to women in same-sex marriages.[18]  Because it is undisputed that LC and MG were married at the time that the child was born, LC is presumed to be the legal parent of the child.

**B.   LC did not rebut the presumption of parentage by clear and convincing evidence.**

LC next argues that even if she is presumed to be the legal parent of the child, she "met her burden to rebut the presumption by clear and convincing evidence," and therefore concludes that the family court erred in denying her petition for disestablishment of parentage.  LC notes that

> the totality of the factual circumstances that existed here
> do not warrant finding the existence of a parent-child
> relationship between LC and the Child because LC did not

---

[18]   While we need not address MG's additional constitutional argument, <u>see</u> <u>DW Aina Leʻa Dev., LLC v. Bridge Aina Leʻa, LLC.</u>, 134 Hawaiʻi 187, 217-18, 339 P.3d 685, 715-16 (2014), at least one other jurisdiction has recently held that <u>not</u> applying the marital presumption of parentage to same-sex spouses violates the Fourteenth Amendment to the United States Constitution.  <u>See</u> <u>McLaughlin v. Jones</u>, 401 P.3d 492, 498 (Ariz. 2017) ("The marital paternity presumption is a benefit of marriage, and following [<u>Pavan v. Smith</u>, 137 S. Ct. 2075 (2017) and <u>Obergefell v. Hodges</u>, 135 S. Ct. 2584 (2015)] the state cannot deny same-sex spouses the same benefits afforded opposite-sex spouses.").

> consent to the [IUI] procedure, did not participate in the conception or birth of the Child, was not present when the Child was born, did not give her name to the Child . . . , and has never acted as co-parent of the [C]hild.

MG counters that LC "fail[ed] to show that the Family Court was clearly erroneous in its key finding: she 'did not meet her burden of proving by clear and convincing evidence that she did not consent to [MG] undergoing the artificial insemination procedure that resulted in her pregnancy and the birth of the Child.'" (Second alteration in original.)  MG argues that "there was a lengthy, documented history of joint action by LC and MG that both predated and postdated [the child's] conception, all evidencing LC's consistent consent."

Based on the record of this case, I conclude that the family court did not err in concluding that LC did not prove, by clear and convincing evidence, that she did not consent to MG undergoing an artificial insemination procedure that resulted in the birth of the child.

1.  **In cases of artificial insemination, one way to rebut the presumption of parentage is to demonstrate, by clear and convincing evidence, lack of consent to the artificial insemination procedure.**

Once the presumption of paternity has been established, the UPA also provides that it may be rebutted by clear and convincing evidence:

> A presumption under this section may be rebutted in an appropriate action only by clear and convincing evidence.

> If two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls. The presumption is rebutted by a court decree establishing paternity of the child by another man.

HRS § 584-4(b) (2006).

Both parties agree that one way in which a party may rebut the presumption of parentage is to demonstrate, by clear and convincing evidence, that he or she did not consent to the spouse's artificial insemination procedure, and operated under that assumption in the family court and on appeal. Neither party challenges the family court's conclusion of law that "[i]n the context of a child conceived through artificial insemination by donor during a marriage, the presumption of legal parentage incorporates a rebuttable presumption of consent to the artificial insemination."

However, the Majority holds that a spouse cannot rebut the marital presumption of parentage through demonstrating by clear and convincing evidence a lack of consent to the artificial insemination procedure that led to the birth of the child. Majority at 1. To the extent that this position was not argued or briefed by the parties at any point in these proceedings, the Majority errs in raising sua sponte the validity of this method of rebuttal on appeal. Cox v. Cox, 138 Hawaiʻi 476, 491, 382 P.3d 288, 303 (2016) (Recktenwald, C.J., dissenting) ("We need

31

not and should not sua sponte address an issue that was never raised or disputed by the parties at any point." (emphasis in original)).  Moreover, as I interpret the statutory language of the UPA, I conclude that the UPA does not bar a party from attempting to rebut the presumption of parentage in an artificial insemination case by proving that he or she did not consent to the artificial insemination procedure.

Accordingly, I respectfully dissent from the Majority's decision to hold sua sponte that a spouse may not rebut the presumption of parentage by demonstrating lack of consent to an artificial insemination procedure.

      **a.**    **The plain language of HRS § 584-4(b) does not prevent a presumptive parent from rebutting the presumption by demonstrating lack of consent to an artificial insemination procedure.**

If this issue were properly raised, I would agree with the Majority that evaluating whether a certain method of rebuttal is permitted begins with the language of HRS § 584-4(b) itself. Majority at 3.  While it is true that HRS § 584-4(b) does not provide us with much guidance as to how a presumption of parentage under HRS § 584-4(a) may be rebutted, it broadly provides that "[a] presumption under this section may be rebutted in an appropriate action only by clear and convincing evidence." Allowing a presumptive parent to rebut the presumption of

parentage in a birth by artificial insemination by demonstrating, by clear and convincing evidence, that he or she did not consent to the artificial insemination procedure does not conflict with the plain language of HRS § 584-4(b).

The Majority, however, contends that the Legislature's decision to remove the Uniform Parentage Act's (1973) artificial insemination provision from the Hawaiʻi UPA proves that the Legislature rejected the use of evidence of non-consent to an artificial insemination procedure as a means to rebut a presumption of parentage. Majority at 8 n.5. I respectfully disagree.

Section 5 of the Uniform Parentage Act (1973) provided a means to establish parentage in cases of artificial insemination.[19] Specifically, the provision stated that if a husband consented in writing to his wife's artificial

---

[19] Uniform Parentage Act section 5 (Unif. Law Comm'n 1973) provided in relevant part,

> (a) If, under the supervision of a licensed physician and with the consent of her husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband is treated in law as if he were the natural father of a child thereby conceived. The husband's consent must be in writing and signed by him and his wife. The physician shall certify their signatures and the date of the insemination, and file the husband's consent with the [State Department of Health], where it shall be kept confidential and in a sealed file. However, the physician's failure to do so does not affect the father and child relationship.

(Alteration in original.)

insemination procedure, he would be treated as the natural father of the child conceived by that procedure.  Unif. Parentage Act section 5 (1973).  The Legislature expressly removed section 5 from the bill that eventually became our UPA.  See H. Stand. Comm. Rep. No. 190, in 1975 House Journal, at 1019.

From this removal, the Majority concludes that the Legislature "specifically rejected a requirement of consent to artificial insemination for a husband to be recognized as the father of his wife's child conceived through artificial insemination."  Majority at 8 n.5.  But because there is no evidence in the legislative history explaining why the artificial insemination provision was not adopted, we can only speculate as to the reasons for its removal.[20]

Moreover, even if the Majority were correct to assume that the removal of section 5 signaled an intent to reject a requirement of consent to artificial insemination to become a

[20]  For example, the Legislature may have thought that section 5's formal consent procedures to establish paternity, i.e. "the husband's consent must be in writing and signed by him and his wife," were unnecessarily restrictive and against public policy, and thus deleted it from the bill.  See Laura WW. v. Peter WW., 856 N.Y.S.2d 258, 261-62 (N.Y. App. Div. 2008) (stating that even when New York's artificial insemination statute could not establish husband's paternity because he did not consent in writing, "equity and reason require a finding that an individual who participated in and consented to [an artificial insemination procedure] to bring a child into the world can be deemed the legal parent of the resulting child").

This does not necessarily mean that the Legislature meant to entirely bar a spouse's consent to the artificial insemination procedure as a means to establish parentage.  And this would not mean that the Legislature meant to entirely bar non-consent as a means to rebut the presumption of parentage.

legal parent of the child, it does not follow that the Legislature also wished to bar a presumptive parent from rebutting the presumption by demonstrating lack of consent to the artificial insemination procedure.  As the Majority points out, section 5 provided another means to <u>establish</u> parentage in artificial insemination situations, and "was in any event not intended to provide a method of rebutting parentage."  Majority at 11.  Therefore, the removal of this provision does not inherently indicate an intent to bar a method to <u>rebut</u> the presumption of parentage.  Moreover, HRS § 584-4(b) itself does not contain any limiting language, and to the contrary, states broadly that "[a] presumption under [HRS § 584-4(a)] may be rebutted in an appropriate action only by clear and convincing evidence."

Because the omission of section 5 from the UPA does not conclusively demonstrate an intent to bar presumptive parents from attempting to rebut the presumption by demonstrating lack of consent to an artificial insemination procedure, I turn, as the parties did, to the "evidence relating to paternity" provision of HRS § 584-12 for further guidance.  HRS § 584-12(7) provides that evidence related to paternity may include "[a]ll other evidence relevant to the issue of paternity of the child."  Evidence of non-consent to an artificial insemination procedure is relevant

to the issue of parentage, so HRS § 584-12(7) would thus allow evidence of non-consent to be introduced.

This leads me to conclude that HRS §§ 584-4(b) and 584-12(7) would permit a presumptive parent, whether a man or a woman (see HRS § 584-21), to prove, by clear and convincing evidence, lack of consent to the artificial insemination procedure as a means to rebut a presumption of parentage.

While the Majority acknowledges that the marital presumption of parentage under HRS § 584-4(a)(1) is rebuttable in certain circumstances, Majority at 4, it is difficult to see how the Majority's approved methods of rebuttal could apply in the situation here. First, the Majority notes that the presumption "can be rebutted by another HRS § 584-4(a) presumption of parentage if the other presumption 'is founded on the weightier considerations of policy and logic.'" Majority at 4 (citing HRS § 584-4(b)). But because only one presumption exists here, this ground cannot be used to rebut the presumption of parentage in this case.

The Majority also suggests that evidence of the existence of another common law "parent," i.e., a "de facto," "psychological," or "intended" parent, or evidence that disestablishment of parentage is in the best interests of the child, might perhaps rebut the marital presumption of parentage.

36

Majority at 14 n.8.

But in my view, these methods of rebuttal also do not provide a person in this situation with a meaningful way to rebut the presumption of parentage.  First, in the case of another "de facto" parent, HRS § 584-4(a)(4) already presumes parentage if, "[w]hile the child is under the age of majority, [the person] receives the child into [the person's] home and openly holds out the child as his [or her] natural child."  In that situation, HRS § 584-4(b) instructs that the presumption "founded on the weightier considerations of policy and logic controls."  But as just noted, this method cannot apply in situations, like here, where only one presumption in favor of one individual arises.  Second, the Majority already appears to have held that permitting a spouse to rebut a presumption of parentage based on lack of consent to an artificial insemination procedure "does not factor in the best interests of the child."  Majority at 18-19.

Where the language of HRS § 584-4(b) does not bar evidence of non-consent to an artificial insemination procedure to rebut a presumption of parentage, and where the Legislature's decision to remove a means to establish parentage does not clearly indicate a rejection of a means to rebut a presumption of parentage, I believe the Majority errs when it concludes that the UPA bars evidence of lack of consent to an artificial

37

insemination procedure as a means to rebut a presumption of parentage.  This is especially the case when the Majority provides no other meaningful way in which to rebut the marital presumption of parentage in a case involving an artificial insemination procedure.[21]

### b. The Legislature's decision to impose a high burden of proof on any presumptive parent attempting to rebut the presumption of parentage considers the best interests of the child.

Amongst the many policy arguments the Majority employs to reject the parties' assumption that evidence of non-consent to an artificial insemination procedure could rebut the marital presumption of parentage, the Majority suggests that such a method of rebuttal would not be in the best interests of the child.  Majority at 18-19.  I respectfully disagree.  Because the Legislature decided to impose a "clear and convincing" standard of proof on any presumptive parent attempting to rebut a presumption of parentage, this high burden addresses the Majority's concerns regarding the best interests of the child.

---

[21]    While the Legislature might not have made "a distinction regarding the means by which a parentage presumption can be rebutted based on how a child is brought into being," Majority at 14 n.7, issues of consent in situations where sexual intercourse results in the birth of a child can be evaluated differently under the UPA.

In the event that a spouse wishes to disestablish parentage of a child born by sexual intercourse, a court in that situation may rely on genetic testing to determine paternity, and in some situations, must order genetic testing to determine paternity.  HRS § 584-13(c) (2006).  Genetic testing procedures are effectively unavailable in artificial insemination cases where the presumptive parent is not biologically related to the child.

The "clear and convincing" standard of proof is defined as an

> intermediate standard of proof greater than a preponderance of the evidence . . . . It is that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable.

Kekona v. Abastillas, 113 Hawaiʻi 174, 180, 150 P.3d 823, 829 (2006) (citations omitted).  As this court stated in Kekona, a clear and convincing standard of proof is "required to sustain claims which have serious social consequences or harsh or far reaching effects on individuals . . . ."  Id. at 181, 150 P.3d at 830.  In these circumstances, the lower "'preponderance of the evidence' [standard] has been expressly disapproved as an insufficient measure of the proof required."  Id. (citing Iddings v. Mee-Lee, 82 Hawaiʻi 1, 14, 919 P.2d 263, 276 (1996)).

By imposing a clear and convincing standard of proof here, the Legislature determined that it would protect the best interests of the child by making it "difficult" for presumptive parents to rebut the presumption of parentage.  See Unif. Parentage Act § 4 cmt. (1973) ("In accordance with current law in most states relating to the rebuttal of a presumption of 'legitimacy', the presumption is difficult to rebut in that proof must be made by 'clear and convincing evidence.'").  Accordingly, an equivalent burden on the presumptive parent in an artificial

39

insemination case to demonstrate that he or she did not consent to the artificial insemination procedure similarly considers the best interests of the child.

This position is shared by other jurisdictions which have concluded, even in the absence of an artificial insemination provision, that placing a high burden on a spouse to demonstrate that he or she did not consent to the artificial insemination procedure ensures that the best interests of the child are considered. For example, in K.S. v. G.S., 440 A.2d 64, 66 (N.J. Super. Ct. Ch. Div. 1981), the New Jersey court concluded that, even in the absence of a statutory artificial insemination provision, "[p]ublic policy considerations seeking to prevent children born as a result of [artificial insemination] procedures from becoming public charges . . . require that a presumption of consent exist and that a strong burden be placed on one seeking to rebut the presumption." Id. at 68.

Similarly, in In re Baby Doe, 353 S.E.2d 877, 878 (S.C. 1987), the South Carolina Supreme Court also examined spousal consent to an artificial insemination procedure in the absence of a statutory provision. It first looked to other jurisdictions and noted that "[a]lmost exclusively, courts which have addressed [issues of artificial insemination] have assigned paternal responsibility to the husband based on conduct evidencing his

40

consent to the artificial insemination." Id. Accordingly, the South Carolina Supreme Court "[held] that a husband who consents for his wife to conceive a child through artificial insemination, with the understanding that the child will be treated as their own, is the legal father of the child born as a result of the artificial insemination[.]" Id. These cases, while not binding on this court, indicate that imposing a high burden on a presumptive parent in an artificial insemination case to prove, by clear and convincing evidence, that he or she did not consent to the artificial insemination procedure more closely adheres to the statutory language and intent of HRS § 584-4(b).[22]

HRS § 584-4(b) provides that a presumptive parent must be allowed an opportunity to rebut the presumption of parentage. Nothing in the UPA's statutory language nor in the legislative history indicates to me that a presumptive parent in a birth by artificial insemination is barred from presenting evidence that he or she did not consent to the artificial insemination procedure to rebut the presumption. Moreover, the Majority does

---

[22]   This position does not conflict with our opinion in Doe. I generally agree that HRS Chapter 584 was adopted "to ensure that every child, to the extent possible, has an identifiable legal father." Doe, 99 Hawai‘i at 8, 52 P.3d at 262 (emphasis added). The language of HRS § 584-4(b) mirrors that concern by permitting a spouse to rebut the presumption of parentage "only by clear and convincing evidence."

Indeed, no court of which I am aware has actually concluded that a spouse rebutted the presumption of parentage by demonstrating lack of consent to an artificial insemination procedure. See Section III(B)(2) infra.

41

not provide any meaningful way to rebut the marital presumption where only one presumption arises, and where an artificial insemination procedure leads to the birth of a child. This effectively makes a rebuttable presumption irrebuttable, and cannot be what the Legislature intended.[23]

While I would not have addressed this issue in the first instance, for all of these reasons, I would hold that one way that a presumptive parent may rebut the marital presumption of parentage in cases of artificial insemination is to demonstrate, by clear and convincing evidence, that he or she did not consent to the spouse's artificial insemination procedure.

   2.   **LC did not demonstrate by clear and convincing evidence that she did not consent to MG's artificial insemination procedure.**

Because nothing in the statutory language of the UPA bars a presumptive parent in an artificial insemination case from attempting to rebut the presumption of parentage by proving that he or she did not consent to the artificial insemination procedure, I also address whether LC met her necessary burden of proof. Keeping in mind that the UPA intended to make it difficult to rebut a presumption of parentage, <u>see</u> Unif.

---

[23]   I agree with the Majority and note that the Legislature can provide further guidance on establishing and rebutting the presumption of parentage in situations where children are born by artificial insemination. Majority at 14.

Parentage Act § 4 cmt. (1973), I conclude that LC did not prove, by clear and convincing evidence, that she did not consent to the artificial insemination procedure that led to the birth of the child.

> Here, the family court concluded that

>> [LC] did not meet her burden of proving by clear and convincing evidence that she did not consent to [MG] undergoing the artificial insemination procedure that resulted in her pregnancy and the birth of the Child. [LC] therefore has failed to rebut the presumption under HRS § 584-4(a)(1) that she is a legal parent of the Child.

I agree. The record demonstrates that LC did not provide clear and convincing evidence that she did not consent to the artificial insemination procedure. In fact, her actions before and after MG's pregnancy indicate that she wished to be the child's parent.

For instance, text messages between LC and MG while LC was deployed demonstrate that LC acknowledged and assented to the pregnancy.[24] When MG texted LC saying she was taking fertility

---

[24] While the parties did not, at any time, assert the spousal privilege or raise any argument regarding confidential marital communications at trial or on appeal, the Majority notes that Hawaiʻi Rules of Evidence (HRE) Rule 505(b)(2) might prevent private communications like text messages from being used as evidence when one party refuses to disclose them. Majority at 15-17. Of course, in this case, both parties submitted evidence of their communications and texts, so they waived their right to keep these communications confidential.

Moreover, if a party chooses to exercise the confidential marital communication privilege, its non-disclosure in a proceeding to disestablish parentage would make it more difficult for a spouse to prove non-consent to an artificial insemination procedure. This is consistent with the purposes of HRS § 584-4(b), and in my view, not a convincing reason to bar evidence of non-consent to an artificial insemination procedure to rebut a presumption of parentage.

43

pills and ordering vials, LC responded "K @ pills." When MG later texted LC that she was pregnant, LC responded that she wanted to "rub [MG's] tummy and feel our baby," and was excited to tell her family.

Furthermore, LC took additional actions that evidenced an intent to be the mother of the child -- she sent a loving note and poem to MG noting that while MG's body and moods would change, "[LC and the baby] will love [her] through it all." When LC returned home from deployment, she accompanied MG to an ultrasound appointment and a lamaze class.

While LC claimed that she explicitly withdrew her consent to the IUI procedure in a fax to Shady Grove sent on January 1, 2014 (before MG conceived the child), the clinic received the fax on December 9, 2015 (after MG gave birth to the child). The family court found no credible evidence that the clinic or MG received the letter before the child was born.

Finally, LC's attempts to distinguish her case from other cases concluding that the spouse failed to rebut the presumption of consent to artificial insemination are unavailing. In fact, an examination of the evidence in this case leads me to conclude that the cases LC attempts to distinguish are indistinguishable. See Wendy G-M., 985 N.Y.S.2d at 847 (concluding that the same-sex spouse of a mother who gave birth

44

to a child was the legal parent because the record demonstrated, inter alia, that the spouse attended pre-birth classes, participated in baby showers, and celebrated the impending birth on social media); Laura WW., 856 N.Y.S.2d at 263 (determining that the husband failed to rebut the presumption of consent because he was aware that his wife was preparing for an artificial insemination procedure and "proffered no evidence that he took any steps before the [artificial insemination] was performed to demonstrate that he was not willing to be the child's father"); K.S., 440 A.2d at 66-67 (concluding that the husband consented to the artificial insemination procedure even when his wife became pregnant fifteen months after the husband's initial consent because he accompanied her to the artificial insemination procedure).

Here, LC attended pre-birth classes, was aware that MG was taking steps to become pregnant by artificial insemination, did not proffer any credible evidence that she took any steps to withdraw her consent to the artificial insemination procedure, and was so excited when MG told her of the pregnancy that she couldn't wait to tell her family.

Therefore, on this record, I conclude that LC did not prove by clear and convincing evidence that she did not consent to MG's artificial insemination procedure that led to the birth

45

of the child.  The family court did not err in concluding the same.

### IV.  CONCLUSION

In 2013, the Legislature adopted the MEA to recognize marriages between individuals of the same sex, and granted those couples the same rights, benefits, and protections enjoyed by heterosexual married couples.  With those rights came responsibilities.  See HRS § 572-1.8.  Perhaps the greatest of these are the responsibilities of parentage.  A man is presumed to be the legal parent of a child if he and the child's natural mother are married.  HRS § 584-4(a)(1).  We now hold that this presumption of parentage applies equally to a woman who is married to the child's natural mother.

Accordingly, the family court did not err in concluding that the UPA's marital presumption of parentage applies to LC. LC also failed to rebut the presumption of parentage.  Therefore, the family court's November 1, 2016 Decision and Order denying LC's request for disestablishment of legal parentage is affirmed.

| | |
|---|---|
| Rebecca A. Copeland for petitioner-appellant LC | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Peter C. Renn, pro hac vice, and Christopher D. Thomas for respondent-appellee MG | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| Clyde J. Wadsworth for amicus curiae State of Hawai'i | /s/ Michael D. Wilson |

